# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00430-CV

**Nucor Steel - Texas, a Division of Nucor Corporation, Appellant**

**v.**

**Public Utility Commission of Texas, Oncor Electric Delivery Company and
Texas Energy Future Holdings Limited Partnership, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. D-1-GN-08-002467, HONORABLE RHONDA HURLEY, JUDGE PRESIDING**

## O P I N I O N

Texas Energy Future Holdings Partnership ("Texas Energy") sought to acquire
Oncor Electric Delivery Company ("Oncor"), which is a transmission-and-distribution electric
utility. Under the relevant statutory scheme, the Public Utility Commission ("Commission") is
required to analyze whether the acquisition of a regulated utility is in the public interest. *See* Tex.
Util. Code Ann. § 14.101 (West Supp. 2011). Consequently, Texas Energy and Oncor filed various
business commitments with the Commission regarding the acquisition and asserted that the
proposed acquisition was in the public interest. In response, Nucor Steel - Texas, a division of
Nucor Corporation ("Nucor"), intervened and opposed the proposed acquisition. Ultimately, the
Commission determined that the transaction was in the public interest, and the district court upheld
that determination. On appeal, Nucor challenges the Commission's construction of the statutes
setting out the public-interest analysis relevant to the proposed transaction. Essentially, Nucor

argues that the Commission's erroneous construction foreclosed the admission of certain evidence and testimony that Nucor contends should have been considered as part of the public-interest analysis. In addition, Nucor also contends that the Commission's public-interest determination is not adequately supported by the evidence in the record. We will affirm the judgment of the district court.

## STATUTORY FRAMEWORK

As mentioned above, this case involves the acquisition of a utility. For some time now, the legislature has imposed various restrictions on certain business transactions involving public utilities. *See* Tex. Util. Code Ann. § 14.101. A restriction relevant to this case states that if a public utility is going to enter into a transaction that "involves the sale of at least 50 percent of the stock of the utility," the utility must report the transaction to the Commission "within a reasonable time." *Id.* § 14.101(b). After being informed of the transaction, the Commission is required to investigate the proposed transaction in order "to determine whether the action is consistent with the public interest." *Id.* Further, the legislature provided the Commission with the following various factors to consider in making its public-interest determination:

(1) the reasonable value of the property, facilities, or securities to be acquired, disposed of, merged, transferred, or consolidated;

(2) whether the transaction will:

(A) adversely affect the health or safety of customers or employees;

(B) result in the transfer of jobs of citizens of this state to workers domiciled outside this state; or

(C) result in the decline of service;

2

(3) whether the public utility will receive consideration equal to the reasonable value of the assets when it sells, leases, or transfers assets; and

(4) whether the transaction is consistent with the public interest.

*Id.* If the Commission ultimately concludes that the transaction is not in the public interest, the Commission will "take the effect of the transaction into consideration in ratemaking proceedings and disallow the effect of the transaction if the transaction will unreasonably affect rates or service." *Id.* § 14.101(c).

Recently, the legislature enacted another provision that is related to the public-interest analysis. *See id.* § 39.262(o) (West Supp. 2011). In particular, the new provision provides that if a utility or a person seeking to "acquire or merge with" the utility "files with the [C]ommission a stipulation, representation, or commitment" as part of its filing under section 14.101, the Commission "may enforce the stipulation, representation, or commitment to the extent that" it "is consistent with the standards provided by this section and Section 14.101." *Id.* In addition, the provision states that the Commission "may reasonably interpret and enforce conditions adopted under" the new provision. *Id.*

When Texas Energy and Oncor informed the Commission about the proposed transaction, they filed various commitments relating to the transaction. Before performing the public-interest analysis in this case, the Commission asked the parties to provide briefing regarding the scope of the types of information that the Commission may consider in light of the deregulation of the electric market. In particular, although the Commission was not faced with the prospect of being asked to actually enforce one of the proposed commitments, the Commission asked the parties

3

to explain whether the Commission has the authority to enforce every commitment that is made or whether its authority is limited to commitments that affect the regulated transmission-and-distribution-electric utility. After the parties filed their briefs, the Commission determined that its enforcement authority is limited to stipulations affecting the regulated utility. In light of that determination, the Commission made evidentiary rulings limiting the types of evidence that may be admitted in the public-interest hearing to evidence demonstrating how the regulated utility will be affected by the transaction and by the various stipulations made by Texas Energy and Oncor. The determination regarding the scope of the Commission's enforcement authority and the accompanying evidentiary rulings form the basis for this appeal.[1]

**BACKGROUND**

With the preceding in mind, we now summarize the events that led to the dispute at issue. As described previously, Oncor is a transmission-and-distribution electric utility. *See* Tex. Util. Code Ann. § 31.002(19) (West 2007) (defining "transmission and distribution utility").

---

[1] In addition to the provision authorizing the enforcement of stipulations, the legislature also recently promulgated other statutory provisions pertaining to transactions involving an electric utility. *See* Tex. Util. Code Ann. § 39.262(*l*)-(n) (West Supp. 2011). As with section 14.101, the new statutory provisions require utilities to inform the Commission about certain proposed transactions and state that the Commission must approve a transaction provided that it "finds that the transaction is in the public interest." *Id.* § 39.262(*l*), (m). These additional statutory provisions also include new factors for the Commission to consider when it performs a public-interest analysis. *Id.* § 39.262(m) (listing following factors for consideration: whether transaction will adversely affect reliability of service, availability of service, or cost of service). However, the legislature expressly limited the applicability of those new factors to proposed business transactions that were filed with the Commission after the filing at issue in this case. *Id.* § 39.262(n) (stating that subsections (*l*) and (m) do not apply to transactions in which agreement was executed before April 1, 2007, provided that filing for review before Commission was filed before May 1, 2007). Accordingly, the Commission did not consider the new provisions when performing its public-interest analysis.

4

During the time relevant to this appeal, Oncor was a wholly owned subsidiary of TXU Corp. At that time, TXU Corp. also owned two other companies that were affiliated with Oncor. Those companies were TXU Energy (a retail-electric provider) and Luminant (a power-generation company).

Texas Energy sought to acquire TXU Corp. in its entirety, and Texas Energy and Oncor informed the Commission about the proposed acquisition. *See id.* § 14.101 (requiring public utilities to report proposed sales or acquisitions to Commission so that Commission may investigate proposed transactions). Nucor and various other parties intervened and opposed the proposed acquisition.

When Texas Energy initiated the acquisition, it made several business commitments, and Texas Energy and Oncor filed a stipulation with the Commission that set out all of the various commitments. The filed stipulation explained that some of the commitments were designed "to support the separateness of Oncor from the rest of TXU Corp. and its subsidiaries." However, the stipulation also detailed other commitments that were "unrelated to Oncor's business [or] the [Commission] proceeding" and that were only included for "the sake of completeness." Many of those commitments addressed Oncor's affiliates and are the subject of part of the dispute at issue in this case. Specifically, the controversial commitments were promises to reduce the rates charged by the retail-electric provider, to maintain majority ownership of TXU Corp. for more than five years, to reduce the number of planned coal units, and to invest resources into emerging energy technologies.

Early on in the application process, the Commission asked the various parties to brief certain procedural issues regarding the scope of the newly adopted subsection 39.262(o) of the utilities code. *See id.* § 39.262(o). As discussed previously, that provision empowers the Commission

5

to enforce stipulations filed as part of the approval process. In essence, the Commission wanted input from the parties regarding whether the Commission's new statutory authority to enforce commitments allowed it to enforce all commitments that are made or whether the authority is limited only to commitments related to the public utility. Although the Commission was not being asked to enforce any specific stipulation at that time, the Commission was seeking clarification regarding the types of information that it could consider during the public-interest determination regarding the proposed transaction by Texas Energy and Oncor. In other words, the Commission elicited responses regarding whether the Commission is limited to considering how commitments will affect the utility or whether the Commission may more globally consider the effect of the commitments.

After receiving various responses, the Commission issued an order stating that its review of a proposed business transaction under the utilities code is limited in scope. Specifically, the Commission determined that it could only enforce commitments that directly related to a public utility. Essentially, the Commission reasoned that in light of the recent deregulation of the electric industry, the legislature only intended to empower the Commission to enforce commitments that related to a public utility and did not intend to allow the Commission to "evaluate or enforce any commitment made that relates to [an] affiliate of [a] public utility." In light of that determination, the Commission reasoned that it could "only address commitments that directly affect Oncor" in the public-interest analysis under section 14.101 of the utilities code. *See id.* § 14.101.

Soon after the Commission issued its limiting order, Nucor filed discovery requests regarding the four commitments previously discussed that were "unrelated to Oncor's business," but Texas Energy and Oncor objected to the discovery requests as exceeding the scope of the proceeding.

6

The Commission sustained those objections. Later, Nucor attempted to file testimony pertaining to, among other things, the four commitments. When seeking the admission of the testimony, Nucor insisted that the Commission should consider the offered testimony because it demonstrated that the sale of Oncor will have a negative impact on the State as a whole. As with the discovery requests, Oncor moved to strike the testimony as being beyond the scope of the proceeding, and the Commission agreed in part and struck portions of the offered testimony that it determined were beyond the scope of the proceeding.

During the course of the proceeding, Texas Energy and Oncor agreed to amend their initial stipulation in order to address the concerns of some of the intervening parties. Several of the intervening parties endorsed the amendments, and Texas Energy, Oncor, and many of the intervening parties adopted the new stipulation. The new stipulation did not contain the four controversial commitments that did not pertain to Oncor. Nucor did not endorse the new stipulation and continued to object to the acquisition by arguing that the stipulation was not in the public interest.

When contesting the stipulation, Nucor relied on testimony that had been previously submitted by parties that originally objected to the merger but had now changed their minds. Shortly after Nucor filed its objections, the parties whose evidence Nucor relied on moved to withdraw their previously filed testimony. Because the now-settling parties withdrew their testimony, Texas Energy and Oncor moved to strike the portion of Nucor's filings that relied on the withdrawn testimony. The Commission granted the motions to strike and thereby removed portions of Nucor's filed testimony and exhibits.

Ultimately, the Commission issued an order concluding that the proposed acquisition and stipulation were in the public interest, and Nucor appealed the Commission's order. *See* Tex.

7

Gov't Code Ann. § 2001.144(a) (West 2008) (explaining when agency decision is final in contested case), § 2001.145 (West 2008) (stating that final agency decision is appealable). The district court affirmed the Commission's final order, and Nucor appeals the district court's judgment.

## DISCUSSION

On appeal, Nucor presents three issues challenging the district court's affirmance of the Commission's final order. First, Nucor contends that the Commission erred when it determined that the provisions of the utilities code described above only authorized the Commission to "evaluate and enforce" the commitments made by Texas Energy that directly affected Oncor (the public utility). Relatedly, Nucor asserts that the Commission erred by concluding that it could not consider "any broader public interest evaluation of the entire transaction." Second, Nucor challenges the Commission's decision based on the previous determinations to limit Nucor's permissible discovery requests and to remove portions of Nucor's filed testimony. Finally, Nucor argues that the Commission's approval of the stipulation by Texas Energy and Oncor was not adequately supported by evidence in the record.

**The Commission's Interpretation of the Scope of its Authority**

As mentioned above, Nucor challenges the Commission's construction of the various statutes that govern the public-interest analysis that the Commission was required to perform in this case. After this appeal was filed, the supreme court was confronted with a similar situation in which an agency determined that the statutes at issue limited the type of information that it may consider when performing a public-interest analysis. *Railroad Comm'n v. Texas Citizens for a Safe Future*

8

*& Clean Water*, 336 S.W.3d 619 (Tex. 2011). As in the present case, a party challenged the agency's construction as being too narrow and inconsistent with the relevant governing scheme, *id.* at 622-23, and the supreme court explained that the "crux of the dispute, then, is whether the term 'public interest' is a broad, open-ended term, encompassing any conceivable subject potentially affecting the public, or a more narrow term," *id.* at 624. When determining whether to uphold the Commission's interpretation, the supreme court noted that rather than being clear and unambiguous, the meaning of the term "public interest" is instead an amorphous concept. *Id.* at 628.

After setting out the dispute in the case, the supreme court outlined the proper standard by which courts review an agency's construction of an ambiguous statute that the agency is charged with enforcing. Although generally stating that statutory construction is a question of law that appellate courts review de novo, *id.* at 624 (citing *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008)); *see also Fireman's Fund County Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 768-69 (Tex. 2000) (stating that when performing statutory construction, courts should look to plain meaning of words used in statute), the court also explained that reviewing courts also give "serious consideration" or "some deference" to an agency's interpretation of a statute that it is charged with enforcing, *Texas Citizens*, 336 S.W.3d at 624-25, provided that the statutory language at issue is "ambiguous," *id.* at 625 (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006)), and provided that the agency's interpretation "'is reasonable and does not contradict the plain language of the statute,'" *id.* (quoting *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)); *see also id.* (stating that "'alternative *unreasonable* constructions do not make'" statute ambiguous (quoting *Fiess*, 202 S.W.3d at 748)). In addition, the court explained that it "is precisely

9

when a statutory term is subject to multiple understandings that we should defer to an agency's reasonable interpretation." *Id.* at 628. The court then emphasized that deference is particularly warranted when the statutory term at issue is "as amorphous as 'public interest,'" when the agency oversees "a complex regulatory scheme," and when the analysis to be performed "implicates" the agency's technical expertise. *Id.* at 629-30. Finally, the court reasoned that because an agency's interpretation "of a statute it is charged with administering" only has "to be reasonable and in accord with the statute's plain language," an agency's construction does not have to be "the only—or the best—interpretation in order to warrant . . . deference." *Id.* at 628.

As with the agency involved in *Texas Citizens*, the Commission is charged with overseeing a complex regulatory scheme. *See* Tex. Util. Code Ann. §§ 11.002(c) (stating that purpose of public utility regulatory act is to grant Commission authority to protect customers of electric services), 14.001 (West 2007) (bestowing upon Commission power to regulate public utilities within its jurisdiction). Also, the issue in this case involves the boundaries of a similarly amorphous public-interest determination that falls within the Commission's technical expertise. *See id.* § 14.101. Accordingly, we apply the same standard of review that was applied in *Texas Citizens*.[2]

---

[2] In its reply brief, Nucor asserts that the Commission's interpretation is not entitled to any deference because "the Commission provided no discernible reason for making its decision." We disagree. Although Nucor correctly points out that the Commission did not refer to the arguments made by Texas Energy or Oncor regarding the Commission's authority under subsection 39.262(o), the Commission did provide a basis in its order for its limited construction of section 39.262(o). In particular, the Commission stated as follows:

> The Commission finds that the legislative intent of the language in § 39.262(o) indicates that this section only applies to the public utility and to commitments that directly affect the public utility. While the Commission has examined a wide variety of issues related to public utility transactions using the public interest

10

In challenging the Commission's construction of the statutes as prohibiting review and enforcement of stipulations that do not relate to Oncor, Nucor asserts that "nowhere in Section 39.262(o) are there the limitations the Commission claims." More specifically, Nucor argues that no language requires that a stipulation have a "direct effect" on the transmission-and-distribution utility and asserts that the Commission's determination provides no guidance regarding when something directly affects a utility. Instead, Nucor contends that although the Commission typically only has authority over regulated utilities, the plain language of subsection 39.262(o) expansively empowered the Commission to review and enforce any stipulation given as part of a filing under section 14.101, "no matter who made the stipulation." As support for this proposition, Nucor notes that subsection 39.262(o) applies to stipulations made by "an electric utility or transmission and

---

standard in § 14.101(b)(4), most of these proceedings took place prior to S.B. 7 and a restructured electric industry in ERCOT, and are not directly comparable to this proceeding. The restructuring of the electric industry in Texas, as well as the legislative history concerning § 39.262(o), limit the Commission's review of the pending transaction. Therefore, the Commission's determination . . . is that the Commission cannot evaluate or enforce any commitment made that relates to the affiliate of the public utility, and can only address commitments that directly affect Oncor.

In its brief, Nucor also contends that the more thorough explanation for the limited construction that is found in the Commission's appellate brief should be disregarded because it amounts to nothing more than impermissible "*post hoc* rationalization." *See Trans-American Van Serv., Inc. v. United States*, 421 F. Supp. 308, 319 (N.D. Tex. 1976) (stating that reviewing courts may not search record for "*post hoc* rationalizations that the [agency] itself has not articulated as a basis for its result"). Although the Commission elaborated on its construction in its appellate brief, the main thrust of the Commission's briefing on this issue is the same as that expressed in its order: that the Commission does not have authority over the companies affiliated with Oncor because it currently only has authority over public or regulated utilities. Accordingly, we cannot conclude that the Commission's briefing on the issue represents the sort of post hoc rationalization that we should disregard.

11

distribution utility or a *person* seeking to acquire or merge with an electric utility or transmission and distribution utility." Tex. Util. Code Ann. § 39.262(o) (emphasis added). In light of this provision as well as the broad definition for "person" found in the utilities code, Nucor urges that subsection 39.262(o) plainly empowers the Commission to enforce any stipulation filed regardless of whether the stipulation had an effect on the regulated transmission-and-distribution utility and to determine whether all filed stipulations are in the public interest. *See id.* § 11.003(14) (West 2007) (defining "[p]erson" as including individuals, partnerships, mutual or cooperative associations, and corporations"); *see also id.* § 39.262(o) (stating that Commission "may reasonably interpret and enforce conditions adopted under this section").

Similarly, Nucor contends that there is no statutory support in section 14.101 for the limitations imposed by the Commission. In making this assertion, Nucor notes that subsection 14.101(b) requires the Commission to determine if a "transaction" is in the "public interest" and asserts that nothing in the remainder of section 14.101 "suggests that the 'transaction' under review is limited to the public utility (in this case Oncor) or that the 'public interest' is somehow limited exclusively to the regulated electric utility transmission and distribution service." *Id.* § 14.101. To the contrary, Nucor insists that the plain meaning of the wording in the statute supports the opposite conclusions. In addition, Nucor argues that the factors listed in the public-interest analysis under section 14.101—value of property to be acquired, adverse health or safety effects, transfer of jobs, decline of service, consideration given for acquisition, and public interest—are broad considerations that may be applied to anyone seeking to acquire a transmission-and-distribution utility under subsection 39.262(o). *See id.* §§ 14.101, 39.262(o).

12

In addition, Nucor insists that construing the statutes in the manner suggested by the Commission would render subsection 39.262(o) a "functional nullity" because even though the language of the statute seems to expand the Commission's power, the Commission's interpretation provides the Commission "with no more and no less authority than it had under Section 14.101(b) to review mergers and acquisitions of regulated utilities." *See* Tex. Gov't Code Ann. § 311.021 (West 2005) (explaining that when construing statutes, courts should presume that legislature intended entire statute to be effective). Moreover, Nucor contends that if the legislature had intended the limitation suggested by the Commission, the legislature could have easily said that when it promulgated subsection 39.262(o). *See USA Waste Servs. of Houston, Inc. v. Strayhorn*, 150 S.W.3d 491, 494 (Tex. App.—Austin 2004, pet. denied) (explaining that courts presume that every word was deliberately chosen and that excluded words were left out on purpose). Finally, Nucor argues that the Commission's construction improperly favors Texas Energy's private interest in avoiding oversight of the deregulated portions of the acquisition over the public's interest in having "review and enforcement of [all] commitments beneficial to the public that were placed before the Commission, even if not directly applicable to Oncor." *See* Tex. Gov't Code Ann. § 311.021(5) (stating that when performing statutory construction, courts presume that "public interest is favored over any private interest").

Nucor presents a reasonable construction of the various statutes involved to the extent that the language of the statutes could be read as empowering the Commission to review and enforce all stipulations that are filed as part of a section 14.101 application. However, the question to be decided in this case is whether the Commission's interpretation is also reasonable, consistent with the governing statutes, and therefore, entitled to deference.

13

When construing the statutes involved, the Commission took note of the foundational shift in the Texas electricity market that occurred in the time between when section 14.101 was originally enacted and when section 39.262 was amended to add subsection 39.262(o). At the time section 14.101 was enacted, utilities were operating as monopolies that were regulated by the Commission. *See CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coal. of Cities*, 252 S.W.3d 1, 7 (Tex. App.—Austin 2008) (on reh'g), *aff'd in part, rev'd in part sub nom.*, *State v. Public Util. Comm'n*, 344 S.W.3d 349 (Tex. 2011). Under this scheme, a region in Texas "was served by a single vertically integrated utility," *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 684 (Tex. App.—Austin 2005, pet. denied), meaning that a single utility "produced, transported, and retailed electricity" for the region, *Reliant Energy, Inc. v. Public Util. Comm'n*, 101 S.W.3d 129, 133 (Tex. App.—Austin 2003), *rev'd in part sub nom.*, *CenterPoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004).

However, in 1999, the legislature enacted various statutes that began the transition to a competitive retail-service industry. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543 (current version at Tex. Util. Code Ann. §§ 39.001-.910 (West 2007 & Supp. 2010)). Under the new competitive market, "the formerly integrated utilities were required to 'unbundle' and divide into three separate entities: (1) retail electric providers, (2) power-generation companies, and (3) transmission-and-distribution utilities." *Gulf Coast*, 252 S.W.3d at 7; *see* Tex. Util. Code Ann. § 39.051(a)-(b) (West 2007). "After the deregulation process was completed, the power-generation and retail electric markets would be subject to the 'normal forces of competition' and 'customer choices,' but the transmission-and-distribution utilities would remain regulated by the Commission." *Gulf Coast*, 252 S.W.3d at 8 (quoting Tex. Util. Code Ann. § 39.001(a) (West 2007)).

14

Consistent with the statutory mandate, a formerly integrated utility was unbundled and divided into Oncor, an affiliated retail-electric provider, and an affiliated power-generation company. As a result, only Oncor was still subject to regulation by the Commission, but its affiliated companies were not. In light of this dramatic regulatory shift, the Commission concluded that its enforcement powers under subsection 39.262(o) extended only to stipulations that affected the company over which it had regulatory authority (Oncor) and not to stipulations that related to companies affiliated with Oncor but did not directly affect Oncor.[3] For that reason, the Commission also determined that it may only consider evidence related to the regulated utility when considering whether a proposed transaction is in the public interest under section 14.101 of the utilities code. *See* Tex. Util. Code Ann. § 14.101.

The Commission's limiting interpretation is supported by the language in section 14.101. Section 14.101 applies to transactions involving a "public utility" and imposes obligations and restrictions on public utilities. *See id.* After deregulation, Oncor remained a public utility by statutory directive, but the affiliated companies did not. *See id.* §§ 11.004 (defining "public utility"

---

[3] As support for its assertion that the Commission's limited interpretation of subsection 39.262(o) is incorrect, Nucor refers to two cases addressing controversies arising prior to deregulation in which courts broadly described the Commission's authority over agreements between parties. *See In re Entergy Corp.*, 142 S.W.3d 316, 324 (Tex. 2004) (stating that merger agreement between utility and various parties was basis for Commission's approval of merger and that administrative character that gave effect to merger agreement also gave Commission authority to adjudicate disputes arising from agreement); *Public Util. Comm'n v. Southwestern Bell Tel. Co.*, 960 S.W.2d 116, 119-20 (Tex. App.—Austin 1997, no pet.) (explaining that power to conduct adjudicative proceedings necessarily includes "power to accept and act upon an agreement between the parties that removes from dispute and litigation a subsidiary issue of fact or law" and "power to formulate and award a reasonable remedy to effectuate the agreement"). However, nothing in either of those cases compels a conclusion that the Commission's limited interpretation, particularly in light of the deregulation of the electric market, is inconsistent with the governing statutory language.

15

as including electric utilities), 31.002(6) (West 2007) (specifying that term "electric utility" includes transmission-and-distribution utility but expressly excluding power-generation companies and retail-electric providers); *see also id.* § 36.001(a) (West 2007) (authorizing Commission to "regulate rates of an electric utility"). Accordingly, the Commission's construction of section 39.262(o) as pertaining only to stipulations involving Oncor is consistent with the focus in section 14.101 on public utilities.

In light of the dramatic change in the electric market and in light of the Commission's newly diminished regulatory role, the Commission's construction of the statutes at issue is reasonable and consistent with the language of the statutes at issue as well as the entire statutory structure changing the Texas electric market to a competitive and deregulated market. *See Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998) (explaining that when determining legislative intent, entire act, not isolated portions, must be considered).[4]

We also observe that the Commission's interpretation is consistent with the legislative history pertaining to the enactment of subsection 39.262(o). *See* Tex. Gov't Code Ann. § 311.023(3)

---

[4] We note that subsection 39.262(o) does not require the Commission to enforce stipulations filed. *See* Tex. Util. Code Ann. § 39.262(o). Instead, the legislature stated that the Commission "may enforce" filed stipulations. *Id.* Accordingly, the legislature has left the decision regarding whether to enforce a stipulation to the Commission's discretion. *See* Tex. Gov't Code Ann. § 311.016(1) (West 2005) (explaining that legislature's use of word "[m]ay creates discretionary authority"). Even assuming that the Commission could exert authority over stipulations unrelated to a public utility, in light of the legislature's decision to deregulate the electric market, we would be unable to conclude that the Commission abused its discretion by refusing to consider stipulations that do not relate to Oncor. *See* Tex. Gov't Code Ann. § 2001.174(2)(F) (West 2008) (allowing court to reverse agency's order if agency's determinations are "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion"); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985) (explaining that action is abuse of discretion if it occurs without reference to any guiding rules or principles or is arbitrary or unreasonable).

(West 2005) (explaining that when construing statutes, court may consider legislative history).

Subsection 39.262(o) was enacted by house bill 624 in 2007. Act of May 23, 2007, 80th Leg., R.S., ch. 1186, § 1, 2005 Tex. Gen. Laws 4049, 4049. That same year, a competing bill, senate bill 482, was also proposed and covered many of the same topics addressed by house bill 624. Ultimately, senate bill 482 did not pass, but it contained a provision that was identical to that of subsection 39.262(o) with the exception of the section numbers. *Compare* Tex. Util. Code Ann. § 39.262(o), *with* Conf. Comm. Rep't, S.B. 482, 80th Leg., R.S., at p. 24 (May 20, 2007); *see* Conf. Comm. Rep't, S.B. 482, 80th Leg., R.S., Section-by-Section Analysis, at p. 16. When discussing the breadth of the enforcement power bestowed by senate bill 482, representative Miller explained that the proposed amendments only dealt with "regulated industries, which are the transmission lines" and do "not touch generation [or] retail." H.J. of Tex., 80th Leg., R.S. 1866 (2007). Further, Miller confirmed that the amendment did not "impact competitive companies." *Id.*[5]

_____

[5] Although we generally recognize that courts should be wary of using the legislative history for statutes that were not enacted in order to divine the meaning of a statutory provision that actually became law, *see Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 442-43 (Tex. 2009), we believe that the legislative history for senate bill 482 is noteworthy in this case given that the relevant statutory language proposed in senate bill 482 is identical to the language enacted and codified into subsection 39.262(o), *compare* Conf. Comm. Rep't, S.B. 482, 80th Leg., R.S., at p. 24 (May 20, 2007), *with* Tex. Util. Code Ann. § 39.262(o).

In its reply brief, Nucor refers to the summary provided by the Texas Legislative Council as support for its broader interpretation of subsection 39.262(o). *See* Texas Legislative Council, *Summary of Enactments*, 80th Leg., R.S., at 432 (2007); *see also* Tex. Gov't Code Ann. § 323.001 (West 2005) (specifying who members of council are). In that summary, the Council wrote that house bill 624 authorizes the Commission "to enforce" a "stipulation, representation, or commitment" filed by an electric utility, transmission-and-distribution utility, or "acquisition or merger party." *Summary of Enactments*, 80th Leg., R.S., at 432. After referring to this language, Nucor urges that the language in the summary demonstrates that the legislature intended to make all stipulations filed be subject to enforcement by the Commission regardless of whether the stipulations

Morever, we cannot agree with Nucor's assertion that the Commission's interpretation renders subsection 39.262(o) a functional nullity. Although it is true that the Commission's interpretation of the statutes at issue more sharply limits the Commission's authority to review and enforce stipulations than the interpretation offered by Nucor, that fact does not render subsection 39.262(o) a nullity. Further, prior to the enactment of subsection 39.262(o), the Commission had no express statutory authority to enforce stipulations filed as part of a notification of a proposed transaction under section 14.101. In fact, in reviewing a filing under section 14.101, the Commission is only explicitly permitted to "disallow the effect of the transaction if the transaction will unreasonably affect rates or service" and to "take the effect of the transaction into consideration in ratemaking proceedings." Tex. Util. Code Ann. § 14.101(c). However, subsection 39.262(o) granted the Commission the additional authority to enforce stipulations made as part of a filing under section 14.101. *Id.* § 39.262(o).

Furthermore, although Nucor correctly points out that the Commission's interpretation shields portions of the transaction pertaining to affiliated companies from oversight by the Commission, in light of the fact that the affiliated companies are no longer subject to regulation by the Commission, we cannot agree with Nucor's assertion that the Commission's interpretation somehow improperly elevated Texas Energy's private interests over that of the public.[6]

directly affect a regulated utility. Although the report does not specify whether a stipulation must directly affect a regulated utility to be enforceable, the report does not explicitly contradict the Commission's interpretation either.

[6] As discussed previously, in addition to enacting subsection 39.262(o), the legislature also added other subsections to section 39.262 but limited the applicability of those subsections to transactions occurring after the one at issue in this case. *See* Tex. Util. Code Ann. § 39.262(*l*), (m). One of those new subsections—subsection 39.262(m)—provides factors for the Commission to

18

Because we conclude that the Commission's construction of subsection 39.262(o) is reasonable and consistent with the plain language of that statute as well as the statutes deregulating the electric industry, we hold that the trial court properly upheld the Commission's construction. Accordingly, we overrule Nucor's first issue on appeal.

**The Commission's Limitations on Discovery and the Admission of Testimony**

In its second issue, Nucor argues that various evidentiary rulings by the Commission denied it the right to a full hearing and violated its due process rights and its right to equal protection under the law. *See* U.S. Const. amend. XIV, § 1; Tex. Const. art. I, §§ 3, 19. When reviewing an agency's rulings on the admission or exclusion of evidence, appellate courts apply an abuse-of-discretion standard. *Texas Dep't of Pub. Safety v. Nordin*, 971 S.W.2d 90, 93 (Tex. App.—Houston [14th Dist.] 1998, no pet.); *see* Tex. Gov't Code Ann. § 2001.174(2)(F) (West 2008) (stating that courts may reverse agency order under substantial-evidence standard when order is "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion"). Under this standard, an agency abuses its discretion if it acts without reference to any guiding rules

consider when deciding whether a proposed transaction is in the public interest. Although that subsection does not apply to the transaction here, the factors provide some insight regarding what the legislature intended the Commission to consider after deregulation. It is worth noting that the legislature directed the Commission to consider whether "the transaction will adversely affect the reliability of service, availability of service, or cost of service of the . . . *transmission and distribution utility*." *Id.* § 39.262(m) (emphasis added). Further, although the provision also allows the Commission to consider those effects on an "electric utility," the definition of electric utility does not include power-generation companies or retail-electric providers that were unbundled from a formerly integrated utility. *See id.* § 31.002(6), (10), (17) (West 2007) (defining electric utility, power-generation company, and retail-electric provider). Accordingly, the legislature has limited the factors to be considered, and this limitation is consistent with the Commission's construction of subsection 39.262(o) as applied to transactions filed under section 14.101.

19

and principles or if its actions are arbitrary or unreasonable. *See City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003).

First, Nucor challenges the Commission's order denying several of its discovery requests. *See* 16 Tex. Admin. Code § 22.141 (2011) (setting scope and forms of discovery). Those requests related to the four commitments that were originally filed by Texas Energy and that did not relate to Oncor (the public utility). For that reason, the Commission determined that the discovery requests were beyond the scope of the proceeding. *See id.* (stating that parties may obtain discovery on matters "relevant to the subject matter in the proceeding" unless matters are privileged or exempted under rules of evidence or civil procedure).

Second, Nucor disputes the Commission's order striking parts of Dennis W. Goins's testimony. Nucor had previously filed testimony from Goins that addressed, among other things, Oncor's affiliates, the four commitments discussed previously, and the scope of subsection 39.262(o). For that reason, Oncor filed a motion to strike parts of Goins's testimony from Nucor's filings, and the Commission granted the motion in part and struck various portions of the testimony.

As discussed above, the Commission determined that the governing statutes only authorized the Commission to review and enforce stipulations that bear upon a regulated utility, and we concluded that the Commission's construction is reasonable, consistent with the governing statutory scheme, and therefore, entitled to deference. In light of that determination, we cannot conclude that the Commission abused its discretion by denying Nucor's discovery requests for information that did not pertain to Oncor or by striking testimony that also did not address Oncor. See Tex. Gov't Code Ann. § 2001.051 (West 2008) (stating that party in contested case is

20

entitled to opportunity to present evidence on issues "involved in the case"); Tex. Util. Code Ann. § 14.054(b)(1) (West 2007) (addressing settlements of contested cases and saying that parties are entitled to hearing "on issues that remain in dispute"). In fact, Nucor essentially conceded in its reply brief that this portion of its second issue is dependent on a determination that the Commission improperly narrowed the scope of its review.

In its second issue, Nucor also criticizes another decision by the Commission that limited other testimony that Nucor sought to introduce. As mentioned before, several parties in addition to Nucor originally objected to the proposed acquisition of Oncor. The Commission Staff also initially objected to the proposed transaction. When the parties and the Commission Staff objected, they filed testimony from various witnesses contending that the proposed transaction was not in the public interest. Under Commission rules, testimony from expert witnesses must be pre-filed, but the testimony is not admitted into the record until it is offered by a witness and until the witness testifies that the "testimony is a true and accurate representation of what the testimony would be if the testimony were to be given orally at the time the written testimony is offered into evidence." 16 Tex. Admin. Code § 22.225 (a)-(b) (2011). Although the testimony at issue was pre-filed with the Commission, it was not admitted into the administrative record. After Texas Energy agreed to modify the stipulations that it originally proposed in order to address some of the concerns of the objecting parties, the Commission Staff and many of the parties that originally objected to the acquisition changed their minds and endorsed the proposed transaction.

Because Nucor was concerned that some of the previously objecting parties might withdraw the testimony that they had previously filed, Nucor asked the Commission to inquire

21

whether the parties intended to have their previously filed testimony offered into evidence. The Commission issued an order asking all intervening parties as well as the Commission Staff to confirm "whether their previously filed direct testimony will be offered into evidence." After the order was issued, Nucor submitted its proposed testimony, including Goins's testimony. Goins's proposed testimony partially relied on the testimony of a Commission Staff witness, Dr. Craig Roach, and a witness for Texas Industrial Energy Consumers ("Texas Industrial"), Jeffry Pollock, that had been filed prior to Texas Energy's modifications. Nucor also attached as an exhibit to Goins's testimony a copy of Roach's testimony. However, after Nucor filed its testimony, the Commission Staff and Texas Industrial elected to withdraw the testimony by Roach and Pollock that they had previously submitted.

On appeal, Nucor contends that the Commission erred by allowing the Commission Staff and Texas Industrial to withdraw the previously filed testimony of Roach and Pollock and also asserts that it was error to allow the Commission Staff and Texas Industrial to withdraw their testimony after having the opportunity to review the testimony that Nucor filed. Under the Commission's rules, the only express prohibition on the ability to withdraw evidence during proceedings before the Commission limits the ability of an individual to withdraw evidence *after* it has been admitted into the record. 16 Tex. Admin. Code 22.225(e) (2011) (stating that party may withdraw evidence after it has been admitted into record only by agreement of all parties to proceeding). As mentioned above, although the testimony at issue was pre-filed with the Commission, both the Commission Staff and Texas Industrial withdrew their pre-filed testimonies before they were admitted into the record. *See id.* § 22.225(a)-(b). Nucor has not referred us to any rule, statute,

22

or case law that explicitly prohibits the Commission from allowing individuals to withdraw proposed testimony before it is admitted into the record. It is also worth noting that Nucor has not referred us to any request that it made to the Commission after the parties withdrew their testimony that asked for an extension of time to file or to modify its testimony in response to the withdrawal.

Furthermore, as described previously, the pre-filed testimony was initially offered to show that the proposed transaction was not in the public interest, and the Commission authorized the withdrawal after Texas Energy and Oncor made significant modifications to the proposed transaction. Moreover, as a result of those modifications, neither Texas Industrial nor the Commission Staff continued to believe that the transaction was against the public interest. In fact, they endorsed the modified transaction.

In light of the above, including the changes made to the stipulation, we cannot conclude that the Commission abused its discretion by allowing the Commission Staff and Texas Industrial to withdraw their previously filed testimony.

After Texas Industrial and the Commission Staff withdrew the testimony of Roach and Pollock, Texas Energy and Oncor filed a motion to strike the portions of Goins's proposed testimony that discussed and extensively quoted from the withdrawn testimony as well as the exhibit containing Roach's testimony. Specifically, Texas Energy and Oncor argued that because the testimony of Roach and Pollock had been withdrawn, the portions of Goins's testimony quoting and referring to their testimony as well as the exhibit constituted impermissible hearsay. *See* Tex. Gov't Code Ann. § 2001.081 (West 2008) (stating that rules of evidence apply to hearings before Commission); Tex. Admin. Code § 22.221 (2011) (same). In other words, Texas Energy and Oncor

23

stated that because those pages "simply restate[d] testimony by" witnesses whose testimony had been withdrawn, "Goins' restatement of their testimony is hearsay—an out of court statement offered to prove the truth of the matter asserted." *See* Tex. R. Evid. 801(d) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). After reviewing the motion, the Commission granted the motion in part and struck all of the testimony by Goins that discussed or quoted the testimony of Roach and Pollock as well as the exhibit containing Roach's testimony.[7]

On appeal, in addition to challenging the Commission's decision to allow the Commission Staff and Texas Industrial to withdraw the testimony of Roach and Pollock, Nucor also challenges the Commission's decision to strike the portion of Goins's testimony that discussed or quoted the withdrawn testimony as well as the exhibit containing Roach's testimony.

In contesting the Commission's ruling, Nucor alleges that the portions of Goins's testimony quoting and summarizing the testimony of Roach and Pollock as well as the accompanying exhibit are either not hearsay or fall within an exception to hearsay. First, Nucor contends that they are admissions by party-opponents and, therefore, are not hearsay by definition.

---

[7] On appeal, Nucor contends that the Commission erred by striking portions of Goins's testimony without setting out the reasons why the testimony should be removed. Although Nucor correctly points out that the ordering paragraph does not explicitly say why portions of Goins's testimony were stricken, Texas Energy and Oncor's motion provided only one basis for the removal of the testimony at issue. In particular, they urged that nearly all of the testimony appearing on pages eight through eleven as well as the entirety of the accompanying exhibit was hearsay. Moreover, the Commission summarized in its order the hearsay arguments made by Texas Energy and Oncor and the responsive arguments made by Nucor and then stated that it was striking the testimony of Goins "[a]fter reviewing the pleadings" by the parties. Accordingly, we cannot agree with Nucor's assertion that the Commission's order was improper because it provided no basis for the exclusion.

24

*See id.* R. 801(e)(2) (setting out circumstances in which statement may be admitted as admission by party-opponent).

However, we believe that Nucor's reliance on the rule addressing statements by party-opponents is misplaced. That rule, by its terms, applies only to admissions by a party to the proceeding. *Id.* The Commission was the adjudicative body with which Nucor sought to file testimony, not a party to the proceeding. Accordingly, the Commission could reasonably have concluded that its Staff did not qualify as a "party" to that proceeding as that term is used in the rule governing admissions by party-opponents. Accordingly, the Commission could have determined that the testimony originally proposed by the Commission Staff and later withdrawn could not be admitted as an admission by a party-opponent.

For different reasons, we also believe that Nucor's reliance on the rule as support for the admission of testimony previously filed by Texas Industrial is equally misplaced. At the time that Texas Industrial initially offered the testimony, the interests of Texas Industrial and Nucor were aligned because they each opposed the proposed transaction. Moreover, after Texas Industrial initially filed the proposed testimony of Pollock, Texas Industrial entered into the agreed stipulation that settled all of its issues pertaining to the proposed transaction. That settlement effectively ended Texas Industrial's participation in the case. Although Texas Industrial still filed a brief and participated in the hearings after entering into the stipulation, its primary involvement in the case was limited to demonstrating that it was now in favor of the transaction and stating its reasons for no longer contesting the transaction. For these reasons, we believe that the Commission could

25

reasonably have determined that the testimony originally proposed by Texas Industrial and then withdrawn was not admissible as an admission by a party-opponent in the case.

As mentioned above, Nucor also contends that portions of Goins's testimony as well as the accompanying exhibit were admissible under an exception to the hearsay rule. Specifically, Nucor contends that the parts of Goins's testimony discussing and quoting the Commission Staff's witness (Roach) as well as the exhibit containing Roach's testimony were admissible as public records. *Id.* R. 803(8)(C). The public-record exception provides, in relevant part, that the following types of documents are not excluded by the general prohibition against the admission of hearsay:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth:
>
>> (C) in civil cases as to any party . . . , factual findings resulting from an investigation made pursuant to authority granted by law;
>
> unless the sources of information or other circumstances indicate lack of trustworthiness.

*Id.*

Nucor contends that the requirements of the rule were met because Roach was paid by the Commission Staff to prepare testimony and because his testimony "is essentially a report reflecting his expert opinion and conclusions regarding the underlying transaction." Further, Nucor argues that Roach's testimony regarding the protective measures that should be imposed as part of the transaction "are factual findings resulting from his investigation, which was conducted pursuant to instructions given by Staff, under authority granted by law." Finally, Nucor alleges that the

Commission Staff must have considered Roach's testimony to be trustworthy or else they would not have retained his services or initially filed the testimony.

However, Nucor has referred to no statute, rule, or case concluding that proposed testimony from an expert witness who was hired by the Commission Staff qualifies as a public record. Further, although Roach was hired by the Commission Staff, no showing was made that he was under the supervision of the Commission Staff when he researched and prepared his testimony. *Cf. Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 676 (Tex. App.—Texarkana 1991, writ denied) (stating that rule 803(8) "is applicable only when the exhibit is prepared by public officials or employees under their supervision in the performance of their official duties," that "[d]ocuments prepared by private individuals and filed with a governmental agency are not official documents as contemplated by Rule 803(8)," and that even if individual preparing document is under contract with agency, document is not public record if individual preparing document was not under supervision of public official). In addition, Nucor has provided no support for the proposition that a hired expert's proposed testimony could qualify as "factual findings resulting from an investigation made pursuant to authority granted by law." Although the Commission Staff hired Roach to prepare testimony, that does not automatically render his review of the proposed transaction an investigation performed under "authority granted by law."

Finally, we have been unable to find any support for the idea that the mere filing of proposed testimony renders the testimony a public record under rule 803(8). The absence of support is even more compelling in a case like this where the testimony was pre-filed but was not admitted into the record before it was withdrawn. *See* 16 Tex. Admin. Code 22.225(a)-(b).

27

In light of the preceding, we cannot conclude that the Commission abused its discretion by failing to conclude that the portion of Goins's testimony at issue as well as the accompanying affidavit were admissions by party-opponents or that they qualified under the public-record exception to the hearsay rule. Moreover, because the testimony and exhibit were offered to prove that Pollock and Roach objected to the proposed transaction, we cannot conclude that the Commission abused its discretion by striking the testimony and the exhibit as hearsay. *See* Tex. R. Evid. 801, 802.[8]

In a final challenge to the Commission's decision to strike portions of Goins's testimony, Nucor contends that the Commission's order granting Texas Energy and Oncor's motion to strike is arbitrary and unreasonable on its face because the Commission "refused to grant Nucor's argument that testimony filed by Oncor [and Texas Energy] should be stricken on the same grounds" that Oncor and Texas Energy alleged in their motion to strike. Stated differently, Nucor alleges that because the Commission struck the portion of Goins's testimony that discussed testimony by other witnesses that had been withdrawn, the Commission should have also struck the rebuttal testimony filed by Texas Energy and Oncor that responded to testimony that had been withdrawn.

As support for this argument, Nucor refers to its administrative filing entitled "Nucor Steel - Texas' Response to TEF's and Oncor's Motion to Strike Supplemental Direct Testimony of Dr. Dennis W. Goins." In that filing, Nucor argued that the portions of Goins's testimony that Texas

---

[8] In its reply brief, Nucor also contends that the stricken parts of Goins's testimony as well as the exhibit were admissible "as the deliberate creation of hearsay exceptions by the [Commission] in permitting parties to withdraw testimony *after* having had a chance to review Nucor's testimony addressing the settlement." Having reviewed the record, we cannot agree with Nucor's assertion that the Commission's actions could have somehow created a hearsay exception.

28

Energy and Oncor objected to should not be stricken because they were relevant to the subject matter at issue, were admissible under the public-record exception to hearsay, and were admissions by a party-opponent. Near the end of the response, Nucor asserted that Texas Energy and Oncor had "made no attempt to withdraw their own rebuttal testimony, almost all of which was prepared to refute direct testimony that their co-Signatories have now elected to withdraw." Further, Nucor argued that in light of Texas Energy and Oncor's contentions that portions of Goins's testimony should be stricken, the Commission "should strike all of Movants' rebuttal testimony responding to witnesses whose testimony will not be offered into evidence at hearing" and then listed the rebuttal testimony of six witnesses that had been filed by Texas Energy or Oncor.

However, nothing in the title of the filing indicates that Nucor was actually seeking to strike the testimony of any witness; on the contrary, the title stated that the filing was a response to Texas Energy and Oncor's motion to strike testimony. Furthermore, with the exception of the argument regarding Texas Energy's and Oncor's witnesses that was discussed above, the whole thrust of the filing was that Goins's testimony should be admitted in its entirety. *See In re Brookshire Grocery Co.*, 250 S.W.3d 66, 72-73 (Tex. 2008) (explaining that nature of motion and relief sought are not ascertained by simply looking at motion's caption and that courts also look to substance of motion); *Finley v. J.C. Pace, Ltd.*, 4 S.W.3d 319, 320 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (stating that substance of motion is gleaned from body of motion and from "prayer for relief"). Furthermore, the prayer for relief failed to alternatively plead that in the event that the Commission grants Texas Energy and Oncor's motion to strike, the Commission should also strike the testimony that Nucor highlighted. In fact, the prayer makes no mention of striking any

29

testimony at all. On the contrary, the prayer requested "that [Texas Energy] and [Oncor's] Motion to Strike be denied and that Nucor be granted such further relief to which it may be entitled." In addition, after the Commission granted Texas Energy and Oncor's motion to strike, Nucor did not file its own motion to strike the testimony of the six witnesses listed in its response, nor did it object when those witnesses' testimonies were later admitted into the administrative record. *Cf.* Tex. R. App. P. 33.1 (explaining that in order to preserve complaint for appellate review, party must make complaint to trial court in "a timely request, objection, or motion"); *see also Kaufman v. Commission for Lawyer Discipline*, 197 S.W.3d 867, 875 (Tex. App.—Corpus Christi 2006, pet. denied) (stating that party waives right to raise appellate claim if not presented below).

In light of the preceding, we cannot conclude that the Commission's order granting Texas Energy and Oncor's motion to strike was arbitrary or unreasonable or that the Commission abused its discretion when it issued the order.

Having found no abuse of discretion in any of the rulings that Nucor argued were erroneous, we cannot conclude that the Commission's evidentiary rulings deprived Nucor of the right to a fair hearing or violated Nucor's constitutional rights to due process and equal protection.

**The Commission's Order Is Supported by Substantial Evidence**

In its third issue, Nucor contends that there is no evidence supporting the Commission's finding that the non-unanimous stipulation was in the public interest. Nucor groups its various assertions into three sets of arguments.

In its first set of arguments, Nucor argues that the Commission's order does not satisfy the statutory requirements for a final administrative decision because the Commission's order

amounted to no more than bald and conclusory assertions that the transaction and stipulation were in the public interest. *See* Tex. Gov't Code Ann. § 2001.141(b)-(d) (West 2008) (stating that final decision must contain findings of fact and conclusions of law, that findings may only be based on evidence and matters that were "officially noticed," and that findings, "if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings"). Further, Nucor contends that the Commission's order is improper because it contains no reference to evidence in the record.[9]

As discussed previously, most of the parties to this administrative proceeding entered into an agreed stipulation, and the Commission approved that stipulation and incorporated the stipulation into its order. Various cases have described the manner in which agencies may use non-unanimous stipulations. *See City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231 (Tex. 2001); *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994). In particular, an administrative agency is required to consider the stipulation "on its merits," *Corpus Christi*, 51 S.W.3d at 263 (Owen, J., concurring), and may not simply adopt a non-unanimous stipulation, *City of El Paso*, 883 S.W.2d at 183. Stated differently, the incorporation of a non-unanimous stipulation is proper when an agency makes its own independent finding that the stipulation satisfies

---

[9] Nucor also contends that the order is improper and may not be upheld because it contains no discussion of the arguments or evidence offered by the non-settling parties. However, Nucor has referred to no statutory authority or case law for that proposition, and we have been unable to find any. To the contrary, although we were construing a prior version of the Administrative Procedure Act, this Court has concluded that the Commission is only required to state findings that support "its ultimate findings; it is not required to state facts that it rejected and upon which it did not rely in reaching its conclusions." *See Pedernales Elec. Coop. v. Public Util. Comm'n*, 809 S.W.2d 332, 337 (Tex. App.—Austin 1991, no writ).

the relevant governing criteria based on substantial evidence in the record as a whole, *see id.* (discussing adoption of non-unanimous stipulation in rate context and stating that adoption is proper if agency makes finding that proposal will establish reasonable rates for area (quoting *Mobil Oil Corp. v. Federal Power Comm'n*, 417 U.S. 283, 314 (1974))), and when the agency "provides all parties, including non-signatories, the opportunity to be heard on the merits of the stipulation," *id.* at 183-84; *see* 16 Tex. Admin. Code § 22.206 (2011) (providing that when some parties have reached agreement on some or all issues, each party to proceeding still has right to full hearing on issues still in dispute).[10]

As a preliminary matter, we note that Nucor was given the opportunity to be heard regarding the stipulation and the proposed transaction. Although the Commission limited the scope of the proceeding in light of its interpretation of section 39.262(o), Nucor fully and actively participated in the hearings regarding the approval of the transaction, including cross-examining the chief executive officer of Oncor, and filed expert testimony as well as several exhibits contesting that the proposed transaction was in the public interest.

---

[10] Nucor also asserts that the Commission's order cannot be upheld because the Commission did not make a specific finding that the stipulation "resulted in just and reasonable rates." As support for the proposition that the Commission is required to make that type of finding, Nucor refers to *City of El Paso v. Public Utility Commission*, 883 S.W.2d 179 (Tex. 1994). That case involved a situation in which a regulated utility sought to increase its rates. *Id.* at 181. Because *El Paso* was a rate case, the supreme court explained that the Commission was required to independently find that the stipulation resulted in just and reasonable rates.

However, the present case is not a rate case. Rather, this case involves the acquisition of a public utility under section 14.101 of the utilities code. *See* Tex. Util. Code Ann. § 14.101 (West 2007). Accordingly, we cannot conclude that the Commission's failure to make the specific finding suggested by Nucor would constitute grounds for overturning the Commission's order.

Having considered whether Nucor was given an opportunity to be heard on the merits of the stipulation, we now consider whether the Commission made its own finding that the stipulation satisfied the requirements of section 14.101 and whether that determination is supported by substantial evidence. At the conclusion of the proceeding, the Commission issued its order approving the transaction. The order is thirty pages in length and contains 102 findings of fact and 10 conclusions of law. In the introductory paragraphs of the order, the Commission concluded that "the merger fulfills the requirements set forth in" section 14.101 and "that the stipulation reached by certain parties . . . fulfills the standards for approval of non-unanimous stipulation[s] set forth . . . in *City of El Paso v. Public Utility Commission*." Next, the Commission set out the background of the case, including identifying the various parties involved in the case, listing the various hearings that were conducted, and summarizing the proposed transaction and the stipulation entered into by various parties. Following the discussion of the merger, the Commission directly incorporated all of the commitments made in the non-unanimous stipulation in findings of fact 43 through 95.

After listing the commitments in the stipulation, the Commission found that "[b]ased on the record evidence, the terms of the stipulation reached by certain parties in this docket are reasonable" and that "the stipulation reached by certain parties in this docket is in the public interest." Then, the Commission made findings specific to the requirements from subsection 14.101(b). *See* Tex. Util. Code Ann. § 14.101(b). Although the Commission concluded that several of the factors listed in subsection 14.101 did not apply because "the merger does not

33

involve the sale of a utility's assets or a merger of operating utilities,"[11] *see id.* § 14.101(b)(1), (3),

the Commission made findings regarding the remaining factors. Specifically, the Commission

found as follows:

> 98. Based upon the record evidence and the commitments offered by Oncor, the merger will not adversely affect the health or safety of Oncor's customers or employees.
>
> 99. No party presented evidence to rebut [Texas Energy]'s position that the merger will not result in the transfer of jobs of citizens of this state to workers domiciled out of this state.
>
> 100. Based upon the record evidence and the commitment offered by Oncor relative to specific performance and customer service standards, the merger will not result in a decline in service.
>
> . . .
>
> 102. The merger, coupled with the terms of the stipulation, as amended, is in the public interest.

*See id.* § 14.101(b)(2), (4). The Commission also found that "[b]ased upon the commitment by

[Texas Energy] and Oncor that Oncor will not seek to include merger costs in future rate requests,

the merger will not result in Texas ratepayers bearing merger-related costs unrelated to the

corresponding benefits to Texas ratepayers."

At the end of the order, the Commission concluded that the "merger, coupled with

the terms of the stipulation, as amended, meet the requirements set forth in" section 14.101 "to

---

[11] We note that Nucor makes no specific challenge to the Commission's determination that the provisions in subsection 14.101(b) pertaining to the value of the utility's assets and the consideration offered under the transaction had no applicability to the public-interest analysis at issue.

support a public interest finding"; that the "stipulation, as amended, is in the public interest"; and that the "stipulation, as amended, satisfies all of the Commission's standards for review of a non-unanimous stipulation."

The findings underlying the Commission's public-interest determination are supported by substantial evidence in the record. A party challenging an order by the Commission "bears the burden of overcoming a presumption that the Commission's findings are supported by substantial evidence." *Nucor Steel v. Public Util. Comm'n*, 168 S.W.3d 260, 267 (Tex. App.—Austin 2005, no pet.). When determining whether an agency's actions are supported by substantial evidence, courts are prohibited from substituting their judgment for the Commission's "as to the weight of the evidence on questions committed to agency discretion." *Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.) (citing Tex. Gov't Code Ann. § 2001.174 (West 2008)); *see also* Tex. Util. Code Ann. § 15.001 (stating that judicial review of agency action is under substantial-evidence standard); Tex. Gov't Code Ann. § 2001.174(2) (allowing court to reverse agency determination if it is not supported by substantial evidence). In making this determination, courts are not asked to verify whether "the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the agency's action." *Cities of Abilene, San Angelo, & Vernon*, 146 S.W.3d at 748. In fact, the evidence may actually preponderate against the Commission's finding and be upheld as long as there is enough evidence to suggest that the Commission's "determination was within the bounds of reasonableness." *Id.*

Several witnesses testified that the proposed transaction was in the public interest. For example, Dr. William Avera, Texas Energy's witness, testified that the terms of the stipulation

35

"ensure Oncor's financial independence with several ring-fencing provisions and commit [Texas Energy] to maintaining Oncor's capital structure and limiting its embedded debt cost." Furthermore, Avera clarified that the ring-fencing portions of the stipulation isolated Oncor from the financial risks or expenses of its affiliates and "ensures that the risk" from affiliates "does not negatively impact the financial viability of the utility." In addition, Avera explained that the terms of the stipulation also "ensure Oncor's operational independence" and "preserve Oncor's financial independence." Then, Avera related that "[b]ecause Oncor's operations will not be directly affected, the merger does not threaten the health or safety of customers or employees, jobs in Texas, or quality of service." Additionally, Avera explained that as a result of the stipulation, Texas Energy "will expend substantial funds on demand-side management and energy efficiency programs." Avera clarified that the demand-side-management expenditures will be $200 million "over the amount included in Oncor's rates." Further, Avera testified that the stipulation requires Oncor to "make capital expenditures on its traditional system . . . during the next five years." Moreover, Avera stated that the stipulation "establishes detailed reliability and performance standards" that will be effective for five years after the transaction and that "Oncor also agreed to customer service metrics for maintaining street lights and handling customer service requests."

Finally, Avera explained that the stipulation provided additional benefits to the public that were "beyond the Commission's authority to order." In particular, Avera referenced Oncor agreeing to issue a $72 million credit to its customers as well as agreeing to not seek recovery for

various expenses in future rate cases, including a $35 million write-off to Oncor's storm reserve and

a $20.9 million write-off resulting from the restructuring of Oncor's regulated assets.[12]

---

[12] Throughout its first and third issues, Nucor complains that although the Commission's interpretation of the governing statutes limited its ability to consider or enforce commitments to those that directly related to Oncor, the Commission in its public-interest analysis approved stipulations made by "Oncor's unregulated affiliates and unregulated third party market participants." Given that the Commission's construction prohibited Nucor from introducing evidence regarding effects of the transaction beyond those relating to Oncor, Nucor insists that the Commission erred by including commitments relating to unregulated companies. Moreover, Nucor argues that "under the Commission's reading of the law, there is no way to enforce these commitments" and that the allegedly problematic commitments may be disregarded "without penalty."

The commitments Nucor is referring to are the promise to spend $200 million on demand-side management and the $72 million credit Oncor agreed to give to its customers. Specifically regarding the credit, Oncor promised to give the credit to its retail-electric-provider customers. Under the stipulation, the retail providers are required to pass the credit on to their retail customers. In challenging the propriety of this stipulation, Nucor asserts that the Commission will be unable to enforce the commitment because it depends on the actions of unregulated companies. Admittedly, although we need not make a final determination regarding the issue, we do note that based on the Commission's construction, it is not entirely clear that the Commission would be able to force the unregulated companies to pass the credit on to their customers. However, the Commission would unquestionably be able to enforce the commitment as it relates to the obligations imposed on Oncor. *See* Tex. Util. Code Ann. § 39.262(o); *see also id.* § 14.101(c) (authorizing Commission to take "the effect of the transaction into consideration in ratemaking proceedings"). For that reason, we cannot agree with Nucor's assertion that the Commission's inclusion of this commitment in its order was somehow improper.

Under the demand-side-management commitment, Texas Energy agreed to fund $200 million for demand-side-management programs. Further, the commitment required Oncor, through the funding given by Texas Energy, to spend $100 million on demand-side-management issues. The commitment also extensively listed the manner in which Oncor was required to spend the money, including using $16 million for low-income-customer programs. Finally, the commitment explained that Texas Energy would be giving the other $100 million to Texas Energy "affiliates other than Oncor." Other than mentioning Texas Energy's decision to provide funding for companies other than Oncor, the stipulation and the Commission's order make no further reference to that funding. Accordingly, we cannot conclude that the mere mention of this promise, without more, was reversible error or could have somehow invalidated the Commission's limited construction of the governing statutes.

37

Another witness for Texas Energy, Frederick Goltz, similarly testified that the stipulation and transaction were "undoubtedly consistent with the public interest." As with Avera, Goltz explained that the stipulation is designed "to provide reasonable assurance that Oncor will function as a separate company from [its] affiliates and that Oncor will be protected from any possible negative impacts from financial difficulties at those affiliates." Goltz also testified that as a result of the stipulation, Oncor agreed to provide the rate credit discussed above and to not seek to recoup the expenses associated with the transaction through its rates. Further, Goltz stated that Oncor's customers will receive the benefit of improvements to Oncor's efficiency and of additional demand-side-management spending and that under the stipulation, Oncor is required to either maintain or improve its transmission-and-distribution system. In addition, Goltz related that the transaction will not adversely affect any of Oncor's customers or employees because "Oncor will be managed no differently after the closing of the [t]ransaction" and that "Oncor has historically provided safe, reliable service." Additionally, Goltz clarified that the transaction will not result in the transfer of jobs to workers out of Texas and "will not result in a decline of Oncor's services."

In addition to the testimony of Texas Energy's witnesses, Oncor also offered testimony from its chief executive officer, Robert Shapard. Shapard agreed that the transaction was "in the public interest in accordance with [subsection] 14.101(b) and considering the factors identified therein." In his testimony, Shapard agreed with the portions of Goltz's testimony regarding how the requirements of the stipulation separate Oncor from its affiliates and protect Oncor from any negative impacts stemming from one of its affiliate's financial problems. Shapard also discussed the benefits to Oncor's customers, including the credit, the additional money spent on demand-side

38

management and energy-efficiency programs, and the fees that Oncor agreed not to recover in its next rate case. Furthermore, Shapard explained that the stipulation requires Oncor to make significant investments in its transmission-and-distribution system, which Shapard characterized as a "major concession by [Texas Energy] and Oncor." Shapard also related that under the stipulation, Oncor is required to meet certain "aggressive" reliability standards that will lead to rebate payments "if the standards are not achieved." Finally, Shapard testified that the transaction will not result in a decline in service to Oncor's customers due to the capital-investment commitments under the stipulation as well as the additional reliability standards that will be applied and that because Oncor "will be managed no differently after the closing of the [t]ransaction," the acquisition will not affect the health or safety of its employees.

A witness for the Commission Staff, Darryl Tietjen, also testified that the transaction was in the public interest. He explained that the stipulation represented "an acceptable resolution of contested issues in this proceeding as well as in Oncor's current rate proceeding." In addition, Tietjen listed various benefits arising from the stipulation, including the investments in demand-side management, the decision by Oncor to not seek recovery of certain expenses, and the credit that will be given to Oncor's customers. Furthermore, Tietjen explained that the stipulation serves the public interest by providing "certainty on the resolution of a variety of issues, it ensures an outcome that, in the aggregate, is at least equal to—or, in some instances, possibly better than—what would result from continued litigation." Moreover, Tietjen summarized the various commitments that were designed to keep Oncor independent and to insulate Oncor from any potential negative effects stemming from one of its affiliates. Tietjen also mentioned the promise by Oncor to adhere to certain

39

reliability standards as well as Oncor's promise to pay $3.6 billion over the next five years "to support the traditional Oncor system" and to "ensure Oncor's adherence to at least the same levels of capital investment that would have occurred absent the merger transaction."

In light of the preceding, we must conclude that the Commission considered the stipulation on its merits, made its own finding that the stipulation satisfied the relevant statutory requirements, and provided all parties with an opportunity to address the merits of the stipulation. We must also conclude that the stipulation is supported by substantial evidence in the record as a whole.

In its second set of arguments, Nucor contends that two of the commitments contained in the stipulation and that were relied on by the Commission in its determination could not support the Commission's conclusion that the proposed transaction was in the public interest. The first is the one-time $72 million credit offered by Oncor to retail-electric providers that the providers would then pass on to their retail customers. The Commission found that the credit represented "a great benefit for Texas retail consumers." The second involved the $56 million in write-offs to Oncor's storm reserve and from restructuring fees that Oncor promised not to include in its future rate case.

When attacking the propriety of the credit, Nucor asserts that none of the settling parties provided any testimony demonstrating that the amount of the credit, $72 million, was adequate. In making this contention, Nucor refers to the fact that the credit was given in exchange for the Commission's decision to dismiss Oncor's then-pending rate case. Essentially, Nucor theorizes that had the rate case continued, the Commission might have discovered that Oncor's excess

40

revenue well exceeded the amount offered as a credit and that without evidence of Oncor's cost of service, the Commission was unable to evaluate the reasonableness of the credit.[13]  Regarding the write-offs, Nucor contends that the benefit of the write-offs is illusory because there is no guarantee or evidence "that Oncor would have requested recovery of any of these expenses in its 2008 rate case, or that the Commission would have granted that request."

Rather than challenge the evidentiary support for the stipulation as a whole, Nucor posits the concept that reviewing courts may only affirm a Commission's order approving a non-unanimous stipulation if each term of a stipulation is individually supported by substantial evidence. Even assuming that Nucor's assertion is correct, its challenge to these particular findings still fails. As summarized above, various witnesses testified that the credit and the write-offs represented a benefit to Oncor's customers and were in the public interest.  Moreover, although Nucor correctly points out that Oncor's rate case was dismissed prior to a final determination regarding whether and to what amount Oncor had accumulated excess revenue, that uncertainty does not necessitate a conclusion that the finding regarding the $72 million credit was erroneous.  Similarly, the fact that the dismissal of the rate case foreclosed the possibility of finding out whether the Commission would have authorized recoveries during the rate case for the write-offs that Oncor agreed to make under the stipulation does not render the findings pertaining to those write-offs improper.  Undeniably, the

[13] In this set of arguments, Nucor again challenges the Commission's decision to not address or include in its order the evidence that Nucor offered regarding the stipulation.  In particular, Nucor contends that the Commission should have addressed the testimony by Goins stating that the credit was tied to the Commission's decision to dismiss Oncor's then-pending rate case that was initiated when the Commission Staff estimated that Oncor's rates led to $80 million in excess revenue.  In footnote nine, we addressed similar arguments made by Nucor, and for those same reasons, we reject this challenge as well.

stipulation, by its nature as a settlement agreement, foreclosed knowledge of the ultimate outcome had the parties fully litigated the various claims, but Nucor's challenges ignore the actual benefits obtained from the settlement, including a speedier resolution of the issues and recovery without the need for and added expense of continued and protracted litigation. Moreover, although Nucor correctly points out that the Commission may have ultimately forbidden recovery of the expenses that were written off under the stipulation or concluded that Oncor had obtained excess revenues well beyond $72 million, the Commission could have as easily made the opposite determinations. In other words, the stipulation might have given a benefit that otherwise would not have been given had the rate case continued.

In its final set of arguments, Nucor argues that the write-offs had no bearing on whether the proposed transaction was in the public interest. In other words, Nucor argues that the write-offs related to Oncor's rate case but were not relevant to the proposed acquisition of Oncor.[14]

Although those write-offs pertained to Oncor's then-pending rate case, we can find

---

[14] Although it did not contest the following findings in its opening brief, in its reply brief, Nucor seems to challenge several findings regarding steps that were taken to "minimize any deleterious impact the merger might otherwise have on Oncor." Specifically, Nucor contends that those commitments in the stipulation "do absolutely nothing to determine whether with those measures and other elements the merger/acquisition is in the public interest."

As discussed earlier, the legislature provided factors for the Commission to consider when performing a public-interest analysis, including whether a proposed transaction will result in a decline in service and, more generally, whether the acquisition "is consistent with the public interest." See Tex. Util. Code Ann. § 14.101(b)(1)-(4). Given this language, we cannot conclude that the Commission's decision to consider commitments designed to protect the public utility from potential financial ruin was unreasonable or inconsistent with the plain language of the governing statutes. See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water, 336 S.W.3d 619, 625 (Tex. 2011).

no support for the proposition that a concession relating to a rate case could not be included in a stipulation filed under section 14.101 or in an order by the Commission endorsing the stipulation. This seems particularly true given that the Commission is authorized under subsection 14.101(c) to consider the effects of a proposed transaction in a utility's "ratemaking proceedings." Tex. Util. Code Ann. § 14.101(c).

For all the reasons previously given, we overrule Nucor's third issue on appeal.

## CONCLUSION

Having overruled all three of Nucor's issues on appeal, we affirm the judgment of the district court.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed: March 15, 2012