# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00204-CV

### Texas Commission on Environmental Quality
### and Vulcan Construction Materials LLC, Appellants

**v.**

### Friends of Dry Comal Creek, Stop 3009 Vulcan Quarry, Jeffrey Reeh,
### Terry Olson, Mike Olson, and Comal Independent School District, Appellees

## FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY, NO. D-1-GN-20-000941, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

## O P I N I O N

We withdraw the opinion and judgment issued in this cause on September 29, 2022, and issue the following opinion in lieu of the previous one.

The Texas Commission on Environmental Quality (TCEQ) granted Vulcan Construction Materials LLC a permit to construct a rock-crushing plant in Comal County. Various parties who had opposed Vulcan's permit application before the agency, including Friends of Dry Comal Creek (Friends), Jeffrey Reeh, and others (collectively, Protestants), filed separate suits for judicial review of the Commissioners' decision in Travis County District Court. Those suits were later consolidated. The trial court reversed the bulk of the Commissioners' decision and remanded the case to the agency. Vulcan and the TCEQ perfected this appeal. We will reverse the trial court's judgment and render judgment affirming the Commissioners' order.

## Factual and Procedural Background

The TCEQ regulates air pollution from stationary sources pursuant to a delegation of authority under the Federal Clean Air Act (FCAA). *See* 42 U.S.C. § 7410(a). The FCAA requires the U.S. Environmental Protection Agency (EPA) to identify emissions that cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. The EPA sets primary and secondary National Ambient Air Quality Standards (NAAQS) for certain pollutants, identified as "criteria pollutants." *See id.* §§ 7408(a), 7409(a). NAAQS are levels of air quality determined to protect the public health and welfare. The six criteria pollutants for which the EPA has promulgated NAAQS include particulate matter (PM) with a diameter of 10 microns or less ($PM_{10}$) and PM with a diameter of 2.5 microns or less ($PM_{2.5}$).[1] To implement these standards, each state is required to submit for EPA approval a state implementation plan. *See id.* § 7407(a). Each plan must include a New Source Review (NSR) preconstruction permitting scheme to control emissions from new or modified sources of air pollutants. *See id.* § 7410(a)(2)(C).

The FCAA's and EPA's applicable regulations provide extensive requirements for the construction and modification of "major" sources of air pollution under NSR permitting programs. *See Luminant Generation Co., L.L.C. v. E.P.A.*, 675 F.3d 917, 922 (5th Cir. 2012). The present case, however, involves regulation of a "minor" source of air pollution that does not meet the major-source thresholds for total annual emissions. For minor sources, the FCAA simply

---

[1] The "criteria pollutants" are sulfur dioxide, particulate matter, carbon monoxide, ozone, oxides of nitrogen/nitrogen dioxide, and lead. 40 C.F.R. §§ 50.4-.17. The term "non-criteria pollutants" encompasses all other air pollutants.

2

requires each state implementation plan to include an NSR permitting program that ensures the NAAQS are attained and maintained in the state. *Id.*; 42 U.S.C. § 7410(a)(2)(C).

The TCEQ administers the requirements of the FCAA for Texas under an EPA-approved state implementation plan that includes a minor-source NSR permitting scheme. *See* 40 C.F.R. § 52.2270. Although the FCAA does not contain specific requirements for evaluating minor sources, the TCEQ has adopted a six-step procedure for conducting a "full" minor-source NAAQS analysis.

For criteria pollutants, the applicant must demonstrate that a proposed facility will not cause or contribute to an exceedance of the NAAQS. This demonstration is usually made through an air-quality analysis (AQA) supported by air-dispersion modeling. Air-dispersion modeling is a computer-based simulation of how pollutants emitted from a facility will disperse in the atmosphere.

A minor-source NAAQS analysis begins with air-dispersion modeling, which is performed to calculate the off-site ground-level concentration (GLC) of pollutants that will be emitted from a proposed facility. Modeling consists of a mathematical simulation of how pollutants from emission sources will disperse in the atmosphere and what the off-site GLCs of those pollutants will be at different distances and directions. This modeling is then used in an AQA, which is used to compare the anticipated maximum ground-level concentrations ($GLC_{max}$) of pollutants to the NAAQS for the criteria pollutant being evaluated.

While the EPA does not require the use of a preliminary impact analysis in minor-source NSR permits, TCEQ uses this analysis for both major- and minor-source permits. Initially, the $GLC_{max}$ of each pollutant is compared to its Significant Impact Level (SIL). The SILs are minimum thresholds set by the EPA. When the $GLC_{max}$ of a criteria pollutant is below its SIL

level, the EPA expects that emissions of the pollutant will be de minimis and not degrade air quality. Phrased differently, a criteria pollutant for which the $GLC_{max}$ is below its SIL is deemed by the EPA to be of such minimal impact that it could not cause or contribute to a violation of its NAAQS. Thus, when an applicant shows that the $GLC_{max}$ for a criteria pollutant is below the applicable SIL, the NAAQS demonstration is usually complete for that pollutant, such that the remaining steps of the full minor-source NAAQS analysis need not be conducted. If, however, the $GLC_{max}$ for a criteria pollutant exceeds its SIL, the applicant must conduct the additional steps of a full NAAQS analysis.

A full minor-source NAAQS analysis requires modeling the maximum allowable emissions from all on-property facilities and nearby off-property sources to determine the $GLC_{max}$. The applicant must then add a representative background concentration of pollutants to the $GLC_{max}$ to account for emissions from facilities and other sources that are not explicitly modeled. This calculation produces a total maximum off-site GLC, which is then compared to the applicable NAAQS. To obtain authorization under an NSR permit, the applicant's full minor-source NAAQS analysis must demonstrate that the total maximum off-site GLC for each pollutant is less than the applicable NAAQS.

The process is similar for non-criteria pollutants, i.e., contaminants for which the EPA has not established NAAQS and therefore for which there is no SIL. The TCEQ Toxicology Division has developed Effects Screening Levels (ESLs) for numerous non-criteria pollutants. ESLs are not standards but rather are guidelines established to provide a high degree of certainty of protectiveness of the public health and welfare. TCEQ uses a set of guidelines called the "MERA guidance," discussed below, to determine whether a health-effects analysis is necessary for a non-criteria pollutant. If TCEQ determines that such an analysis is necessary, it may require

4

air-dispersion modeling for that pollutant and a comparison of the resulting $GLC_{max}$ against the applicable ESL. Among the non-criteria pollutants for which the TCEQ has developed an ESL is crystalline silica, the contaminant at issue in this case.[2]

When the predicted $GLC_{max}$ of a non-criteria pollutant is below the applicable ESL level, the expected emissions are deemed safe and the demonstration is usually complete for that pollutant. If the $GLC_{max}$ for a non-criteria pollutant exceeds the ESL, however, the applicant must conduct a health-effects analysis in which the applicant's modeling results are compared to the ESL for that pollutant.

The TCEQ does not require a health-effects review for emissions of crystalline silica from rock crushers. The agency has learned from experience and data from throughout the United States that limestone rock-crushing facilities typically emit insignificant amounts of crystalline silica in the 10 micron or smaller range. Accordingly, modeling emissions of $PM_{10}$ and $PM_{2.5}$ and comparing them to the NAAQS is considered by the TCEQ a sufficient level of review.

The Texas Clean Air Act (TCAA) requires that a permit be obtained by anyone planning to construct a facility that may emit air contaminants:

(a) Before work is begun on the construction of a new facility or a modification of an existing facility that may emit air contaminants, the person planning the construction or modification must obtain a permit or permit amendment from the commission.

Tex. Health & Safety Code § 382.0518(a). The Act provides that a permit will be granted if two requirements are met:

(b) The commission shall grant within a reasonable time a permit or permit amendment to construct or modify a facility if, from the information available

---

[2] Although it is a form of PM, which can be a criteria pollutant, crystalline silica itself is a non-criteria pollutant because the EPA has not established an NAAQS specifically for crystalline silica. Nor is crystalline silica included on the EPA's list of 187 hazardous air pollutants.

to the commission, including information presented at any hearing held under Section 382.056(k), the commission finds:

    (1)  the proposed facility for which a permit, permit amendment, or a special permit is sought will use at least the best available control technology [BACT], considering the technical practicability and economic reasonableness of reducing or eliminating the emissions resulting from the facility; and

    (2)  no indication that the emissions from the facility will contravene the intent of this chapter, including protection of the public's health and physical property.

*Id.* § 382.0518(b). The statutory requirements are general, leaving much discretion to the TCEQ.

The agency's relevant administrative rules likewise contain few detailed requirements:

    (a)    In order to be granted a permit, amendment, or special permit amendment, the application must include:

. . . .

      (2)  information which demonstrates that emissions from the facility . . . meet all of the following.

        (A)  Protection of public health and welfare.

          (i)   The emissions from the proposed facility will comply with all rules and regulations of the commission and with the intent of the Texas Clean Air Act (TCAA), including protection of the health and property of the public.

30 Tex. Admin. Code § 116.111(a)(2)(A)(i) (2020) (Tex. Comm'n on Env'l Quality, Gen. Application).

Vulcan applied for a permit to construct a rock-crushing plant at a limestone quarry in Comal County.[3] The application was opposed by numerous groups and individuals, including Friends, Reeh, and others. The TCEQ granted the hearing requests filed by the Protestants and forwarded 19 issues to the State Office of Administrative Hearings (SOAH) for resolution in a contested case hearing. Issue "O" was "Whether emissions of silica from the proposed plant will

---

[3] A rock crusher breaks larger rocks down into cobblestones, gravel, or other smaller pieces that may be commercially useful.

6

negatively impact human health and welfare."[4]  After the hearing, the administrative law judges (ALJs) submitted to the Commissioners a proposal for decision recommending that the permit be granted.  The Commissioners accepted this recommendation, granted the permit, and adopted the findings of fact and conclusions of law set forth in the PFD.

The Commissioners' order granting the application determined in Conclusions of Law 11 and 12 that Vulcan had satisfied the two requirements from Texas Health and Safety Code sections 382.0518(b)(1) and (b)(2) quoted above:

> 11. Consistent with Texas Health and Safety Code § 382.0518 and 30 Texas Administrative Code § 116.11l(a)(2)(C), the Plant will use BACT, with consideration given to the technical practicability and economic reasonableness of reducing or eliminating emissions from the facilities.

> 12. Consistent with Texas Health and Safety Code § 382.0518 and 30 Texas Administrative Code § 116.11l(a)(2)(A), there is no indication that emissions from the Plant will contravene the intent of the TCAA, including the protection of the public's health and physical property.

In Conclusion of Law 14, the Commissioners determined that Vulcan had satisfied the requirements of 30 Texas Administrative Code section 116.111:

> 14. Vulcan has made all demonstrations required under applicable statutes and regulations, including 30 Texas Administrative Code § 116.111 regarding air permit applications, to be issued an air quality permit with conditions as set out in the Draft Permit.

During the course of the SOAH proceeding, a discovery dispute arose regarding Vulcan's health-effects analysis of crystalline silica.  The three cores Vulcan used for its sample of aggregate material in its analysis were part of 41 borings taken in an unrelated 2016 subsurface

---

[4]  Silica, also called silicon dioxide, can appear in three different forms: crystalline silica, cryptocrystalline silica, and amorphous silica.  All three have the same chemical makeup, but crystalline silica has a different molecular structure.  Although Issue O refers generally to "silica," all parties focus their arguments on crystalline silica.

investigation of the proposed site. Vulcan presented evidence that it conducted the earlier investigation to determine whether to purchase the property and how much to pay for it. The investigation provided information on the quantity and quality of limestone available for processing at the site. Friends served written discovery on Vulcan requesting documents relating to the 2016 investigation and any evaluation of aggregate materials to be processed at the Plant. Vulcan objected to producing documents from its earlier investigation, asserting a trade-secret privilege. Friends filed motions to compel and for continuance, both of which were denied by the presiding ALJ. The presiding ALJ also ruled that the Protestants could not cross-examine Vulcan's experts on the subject.

Following issuance of the Commissioners' order, Friends and Reeh submitted motions for rehearing to the agency, which were overruled. They subsequently filed separate suits for judicial review in Travis County District Court, which were later consolidated. In its Final Judgment, the trial court reversed most of the Commissioners' order and remanded the case to the agency. Specifically, the court reversed Conclusions of Law 12 and 14 on several grounds, ruled that the presiding ALJ abused her discretion in allowing Vulcan to withhold information from its 2016 subsurface investigation, and ruled that the Protestants were denied due process by (1) allowing Vulcan to withhold information about the 2016 investigation, (2) denying discovery and cross-examination as to the information, and (3) failing to require Vulcan to input emissions from quarries and roads into its health-effects analysis.[5]

---

[5] The trial court's Final Judgment did, however, expressly affirm the Commissioners' Conclusion of Law 11 regarding the proposed Plant's use of Best Available Control Technology:

> TCEQ's Best Available Control Technology ("BACT") reviews for Vulcan's Application met the standards of Texas Health and Safety Code § 382.0518 and 30

8

The TCEQ and Vulcan perfected this appeal.

**Standard of Review**

The statutory standard for judicial review of a Commission order is whether its decision was "invalid, arbitrary, or unreasonable." Tex. Health & Safety Code § 382.032(e). This Court has held that "[t]he 'invalid, arbitrary, or unreasonable' standard incorporates the entire scope of review allowed by the 'substantial evidence' standard codified in the Administrative Procedure Act." *TJFA, L.P. v. Texas Comm'n on Envtl. Quality*, 632 S.W.3d 660, 666 (Tex. App.—Austin 2021, pet. pending).

The scope of judicial review of agency decisions under the substantial-evidence rule is set forth in the Administrative Procedure Act (APA) as follows:

> If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
> (1) may affirm the agency decision in whole or in part; and
> (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> (A) in violation of a constitutional or statutory provision;
> (B) in excess of the agency's statutory authority;
> (C) made through unlawful procedure;

---

Texas Administrative Code § 116.11l(a)(2)(C), were properly conducted, supported by substantial evidence, and not arbitrary, capricious, or unlawful.

TCEQ rules define "Best Available Control Technology" as follows:

> Best available control technology (BACT)—An air pollution control method for a new or modified facility that through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically practical and economically reasonable for the facility.

30 Tex. Admin. Code § 116.10(1) (2020) (Tex. Comm'n on Env'l Quality, Gen. Definitions).

9

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174. The standards for a substantial-evidence review are well established:

> Under the substantial evidence rule we review the evidence as a whole to determine if it is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. We may not substitute our judgment for that of the agency and may only consider the record on which the agency based its decision. The issue before us is not whether the agency reached the correct conclusion but whether there is some basis in the record for its action. Although substantial evidence is more than a mere scintilla, the evidence in the record may actually preponderate against the agency's decision and nonetheless amount to substantial evidence. We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden to prove otherwise is on the appellant. Finally, the agency's decision should be reversed only if the party challenging the decision demonstrates that the absence of substantial evidence has prejudiced the party's substantial rights.

*Citizens Against Landfill Location v. Texas Comm'n on Envtl. Quality*, 169 S.W.3d 258, 264 (Tex. App.—Austin 2005, pet. denied) (citations omitted); *see also North E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020) ("Review under the substantial-evidence rule is highly deferential—the issue is not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it."). "The question whether an agency's determination meets [the substantial-evidence] standard is one of law." *Texas Comm'n on Envtl. Quality v. Maverick Cnty.*, 642 S.W.3d 537, 547 (Tex. 2022) (quoting *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 566 (Tex. 2000)).

Although an administrative decision that is supported by substantial evidence "is generally not arbitrary and capricious," *State Bd. for Educator Certification v. Tran*, No. 03-18-00855-CV, 2020 WL 6834219, at *8 (Tex. App.—Austin Nov. 20, 2020, pet. denied) (mem. op.) (quoting *Hinkley v. Texas State Bd. of Med. Exam'rs*, 140 S.W.3d 737, 743 (Tex. App.—

Austin 2004, pet. denied)), nonetheless "[i]nstances may arise . . . in which the agency's action is supported by substantial evidence but is nonetheless arbitrary and capricious." *Heritage on San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl. Quality*, 393 S.W.3d 417, 423 (Tex. App.—Austin 2012, pet. denied); *see also* Tex. Gov't Code § 001.174(2)(F); *Texas Health Facilities Comm'n v. Charter Med., Inc.*, 665 S.W.2d 446, 454 (Tex. 1984) ("In enacting the APTRA, it is clear that the legislature intended to distinguish between agency action that is not supported by substantial evidence and agency action that is arbitrary and capricious.").

Only in narrow circumstances, however, will an agency decision be reversed as "arbitrary and capricious" when it is supported by substantial evidence. *See Charter Medical*, 665 S.W.2d at 454 ("The arbitrary and capricious standard of review historically has been construed narrowly, and we do not think that the legislature intended it to be interpreted as a broad, all-encompassing standard for reviewing the rationale of agency actions."). This Court has addressed the potential scope of such circumstances:

> We have previously identified six circumstances under which we have found agency orders to be arbitrary or capricious: "(1) the order not being supported by substantial evidence, (2) the agency denying a litigant's due process so as to prejudice its rights, (3) the agency improperly basing its decision on non-statutory criteria, (4) the agency basing its decision on legally irrelevant factors or not considering legally relevant factors, (5) the agency considering only relevant statutory factors but reaching a completely unreasonable result, and (6) the agency's failure to follow the clear, unambiguous language of its own regulations."

*Tran*, 2020 WL 6834219, at *8 (quoting *Westlake Ethylene Pipeline Corp. v. Railroad Comm'n*, 506 S.W.3d 676, 687 (Tex. App. —Austin 2016, pet. denied));[6] *see also Harris Cty. Appraisal*

---

[6] Emphasizing the narrowness of the circumstances necessary for an agency's act to be found arbitrary and capricious even though supported by substantial evidence, this Court has opined that the finding must be "based on a violation of due process or some other unfair or unreasonable conduct that shocks the conscience." *Santulli v. Texas Bd. of L. Exam'rs*, No. 03-06-00392-CV, 2009 WL 961568, at *4 n.5 (Tex. App.—Austin, Apr. 10, 2009, pet. denied)

11

*Dist. v. Tex. Workforce Comm'n*, 519 S.W.3d 113, 119 (Tex. 2017) ("If an agency does not follow the clear, unambiguous language of its own regulation in making a decision, the agency's action is arbitrary and capricious and will be reversed."); *Public Util. Comm'n of Texas v. Texas Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021) ("A Commission decision is arbitrary if it: '(1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result.'") (quoting *City of El Paso v. Public Util. Comm'n of Texas*, 883 S.W.2d 179, 184 (Tex. 1994)). Stated generally, "we must remand for arbitrariness if we conclude that the agency "'has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making.'" *Texas Health & Hum. Servs. Comm'n v. Lukefahr*, No. 03-15-00325-CV, 2016 WL 5874871, at *2 (Tex. App.—Austin Oct. 6, 2016, no pet.) (mem. op.) (quoting *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819–20 (Tex. App.—Austin 2011), *rev'd on other grounds*, 413 S.W.3d 409 (Tex. 2013)).

## Discussion

### I. *Whether the trial court erred in reversing Conclusion of Law 12.*

As stated above, the Commissioners' Conclusion of Law 12 recited that "there is no indication that emissions from the Plant will contravene the intent of the TCAA, including the protection of the public's health and physical property." To support this conclusion, the Commissioners' order included several findings of fact regarding the potential emission of crystalline silica:

---

(mem. op.) (quoting *Texas State Bd. of Dental Exam'rs v. Silagi*, 766 S.W.2d 280, 285 (Tex. App.— El Paso 1989, writ denied)).

12

44. The maximum offsite concentrations of crystalline silica from Vulcan's modeling are well below the crystalline silica Effects Screening Level.

45. The Plant's crystalline silica emissions will not negatively impact human health and welfare, or contravene the intent of the Texas Clean Air Act (TCAA).

46. The Plant's crystalline silica emissions would not negatively impact human health and welfare, or contravene the intent of the TCAA, even if the crystalline silica percentage used to calculate the Plant's crystalline silica emissions was 135 times higher.

In reversing Conclusion of Law 12, the trial court found in Paragraph 1 of its Final Judgment that the following errors existed in that conclusion of law:

(i) TCEQ's determination that the Plant's crystalline silica emissions will not negatively affect human health or welfare is not supported by substantial evidence; (ii) Vulcan's silica emissions calculations are not based on representative site conditions, and TCEQ's determination that Vulcan's silica emissions calculations are representative of those to be expected from the site is not supported by substantial evidence; and (iii) TCEQ's rejection of Reeh Plaintiffs' assertions regarding ways the Permit allegedly is not sufficiently protective of public health or property is arbitrary and capricious and not supported by substantial evidence.

We will review these grounds in the order recited in the Final Judgment.

### (i) Whether the TCEQ's determination that the Plant's crystalline silica emissions will not negatively affect human health or welfare is supported by substantial evidence.

Regarding Subparagraph 1(i) of the trial court's Final Judgment, as quoted above, the TCEQ and Vulcan argue that the Commissioners' finding on crystalline silica emissions is adequately supported by (1) the "MERA guidance" and, independently, (2) Vulcan's voluntary health-effects analysis.

### (a) MERA guidance.

MERA is an acronym for Modeling and Effects Review Applicability. The MERA guidance is a document created by the TCEQ's Air Permits Division to assist its staff in evaluating applications for projects that are subject to air-quality-impacts analyses. It states in part: "This

13

document provides permit reviewers and air dispersion modeling staff with a process to evaluate and determine air quality impacts analysis requirements for case-by-case permit reviews for new and/or modified facilities." In reviewing an AQA, TCEQ staff members use the MERA guidance to assist in determining the appropriate analysis necessary to demonstrate compliance with the applicable ESLs. TCEQ staff use the MERA guidance, in part, to assess preliminary impact determinations as to certain types of pollutants. If a preliminary analysis shows that the likely impact falls below the applicable ESL and if a more extensive analysis is not found to be appropriate for other reasons, the MERA guidance indicates that no further analysis by the applicant or TCEQ staff is needed for that contaminant.

In the present case, Vulcan's preliminary impact analysis showed that the likely impact of crystalline silica from Vulcan's proposed plant would be far below the TCEQ's ESL level for that pollutant. Under the MERA guidance, therefore, the TCEQ staff did not require Vulcan to conduct any further health-effects analysis as to crystalline silica. This policy was based in part on the TCEQ's prior experience with rock-crushing facilities, which had shown that such facilities produce negligible emissions of crystalline silica.

As a threshold matter, Friends contends that the MERA guidance document constitutes an administrative "rule," asserting that it is an agency statement of general applicability that implements, interprets, or prescribes law or policy or describes the procedure or practice requirements of a state agency. Friends argues that because the MERA guidance is a rule, and because it was not adopted through formal notice-and-comment rulemaking procedures, it is invalid. The Protestants are correct that "[w]hen an agency promulgates a rule without complying with the proper rule-making procedures, the rule is invalid." *El Paso Hosp. Dist. v. Texas Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008); *accord Texas State Bd. of Pharmacy*

14

*v. Witcher*, 447 S.W.3d 520, 527 (Tex. App.—Austin 2014, pet. denied); *see also* Tex. Gov't Code § 2001.035(a) ("A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.").[7] The issue here is whether the MERA guidance constitutes an administrative rule.

Under the APA, the term "rule" is defined as follows:

"Rule":
(A) means a state agency statement of general applicability that:
(i) implements, interprets, or prescribes law or policy; or
(ii) describes the procedure or practice requirements of a state agency;
(B) includes the amendment or repeal of a prior rule; and
(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Tex. Gov't Code § 2001.003(6).

Under the APA's definition, an agency statement does not have to be formally designated a "rule" in order to meet the statutory definition and thus trigger the necessity for adoption by notice-and-comment rulemaking procedures. *See, e.g.*, *Teladoc, Inc. v. Texas Med. Bd.*, 453 S.W.3d 606, 614–15 (Tex. App.—Austin 2014, pet. denied). On the other hand, not every statement by an administrative agency constitutes a rule under the statutory definition. *See Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994); *Combs v. City of Webster*, 311 S.W.3d 85, 100 (Tex. App.—Austin 2009, pet. denied). Administrative agencies often issue letters, guidance, and reports that contain statements that may appear to implement, interpret, or prescribe agency policy and practice but are not rules that must be formally promulgated. *See Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 769 (Tex. App.—Austin 1999, no pet.); *see also Trinity*

---

[7] In response to Friends' invalid-rule argument, the TCEQ argues that Friends did not preserve this alleged error, either in its motion for rehearing before the Commission or in its petition in district court. Because this issue does not affect our ultimate decision, we will assume without deciding that Friends preserved the alleged error.

*Settlement Servs., LLC v. Texas State Secs. Bd.*, 417 S.W.3d 494, 502 (Tex. App.—Austin 2013, pet. denied). The APA "defines 'rule' in a way that will exclude a considerable range of unofficial, individually directed, tentative or other non-proscriptive agency or staff issuances concerning law or policy." *Teladoc*, 453 S.W.3d at 621–22.

In analyzing whether a particular agency statement constitutes a rule, "we consider the intent of the agency, the prescriptive nature of the guidelines, and the context in which the agency statement was made." *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 722 (Tex. App.—Austin 2009, no pet.). Of particular significance in *Leeper*, for example, was that "[t]he [agency's] guidelines were only recommended, not prescriptive." *Leeper*, 893 S.W.2d at 443. This Court, too, has recognized that statements that are not prescriptive fall outside the APA's definition of "rule." *See Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 546 (Tex. App.—Austin 2011, pet. denied) ("[T]he core concept is that the agency statement must in itself have a binding effect on private parties."). Applying the reasoning from *Slay*, this Court has stated that "a distinction exists between nonbinding evaluative guidelines that take into consideration case-specific circumstances—which have been held not to be a rule—and policies that dictate specified results without regard to individual circumstances, which have been held to be a rule." *Witcher*, 447 S.W.3d at 529.

This Court's opinion in *Slay* is particularly helpful in analyzing the present case. There, the legislature had directed the TCEQ to consider a variety of factors in determining what penalties to assess after finding hazardous-waste violations. The TCEQ's enforcement division had created a document, styled "Penalty Policy of the TCEQ," that set forth a methodology explaining how TCEQ staff were to evaluate violations for the purpose of recommending administrative penalties to the Commission. The Penalty Policy stated:

16

> This policy includes a description of how violations are evaluated in terms of harm and severity and how any proposed penalties are determined. It includes a discussion of what adjustments may be made to the base penalty amount after the review of case-specific information and information concerning the respondent.

*Slay*, 351 S.W.3d at 538. Although the administrative record in *Slay* contained evidence that TCEQ *staff* were required to follow the Penalty Policy's methodology in determining penalty recommendations, we held it significant that the record also contained evidence that use of the methodology was not mandatory for members of the Commission: "[W]hat ultimately matters is that the district court also had evidence to the effect that the TCEQ commissioners were not *bound* to follow the Penalty Policy's methodology when exercising their legislatively conferred discretion to impose penalties." *Id.* at 546 (emphasis in original).

The discretionary nature of the Penalty Policy in *Slay* was emphasized in a related TCEQ rule:

> The executive director may use enforcement guidelines that are neither rules nor precedents, but rather announce the manner in which the agency expects to exercise its discretion in future proceedings. These guidelines do not establish rules which the public is required to obey or with which it is to avoid conflict.

*Id.* at 547. Because the Penalty Policy lacked the required prescriptive element, we held that it did not constitute a "rule" within the meaning of the APA. *Id.* at 548; *see Witcher*, 447 S.W.3d at 533 ("Although the guidelines considered in *Slay* were intended to achieve a level of consistency when similar circumstances were present, they did not require a specific result in all cases."); *cf. Entertainment Publ'ns*, 292 S.W.3d at 721 (agency statement held to be rule where "letters [sent by the Comptroller] communicated the Comptroller's intention to apply section 151.024 in *all cases* involving brochure fundraising firms . . . ." (emphasis added)).

In the present case, the relevant MERA guidance document, like the Penalty Policy in *Slay*, states explicitly that its recommended procedures are not mandatory:

17

> While this document provides a general process and defines minimum criteria for agency staff's consideration of air quality impacts analysis requirements, this document is not regulatory and does not limit the permit reviewer's ability to require the applicant to provide additional information. . . . Permit reviewers and air dispersion modeling staff may deviate from this guidance with approval from their supervisors or from the Air Permits Division (APD) director.

Thus, similar to the *Slay* Penalty Policy, a fair reading of the MERA guidance is that it announces the manner in which the TCEQ expects, but is not required, to exercise its discretion in future proceedings.

Simply calling an agency statement a "guideline" or "guidance" does not, of course, automatically prevent it from falling within the APA's definition of a rule. *See, e.g.*, *John Gannon, Inc. v. Texas Dep't of Transp.*, No. 03-18-00696-CV, 2020 WL 6018646, at *7 (Tex. App.—Austin Oct. 9, 2020, pet. denied) (mem. op.). By its own terms, however, the MERA guidance document here does not have the necessary "binding effect" on the TCEQ, its staff, or the public. The TCEQ retains discretion to deviate from the MERA guidance procedures when deemed appropriate.[8] Accordingly, we conclude that the MERA guidance does not constitute a "rule" that would be invalid unless adopted through the statutory notice-and-comment rulemaking process.

Thus, the MERA guidance, which obviated the need for Vulcan to conduct a full health-effects analysis regarding the expected emission of crystalline silica from the proposed Plant, itself provides substantial evidence in support of the relevant findings of fact that supported the Commissioners' Conclusion of Law 12. In addition, however, as discussed below, Vulcan voluntarily conducted its own full-scale health-effects analysis of expected crystalline silica emissions from the site, which further supports Conclusion of Law 12.

---

[8] The existence of this discretion distinguishes the present case from *Sierra Club v. EPA*, 705 F.3d 458, 463–64 (D.C. Cir. 2013), in which the D.C. Circuit disapproved the use of an SIL when the agency lacked such discretion.

**(b) Substantial evidence independent of the MERA guidance.**

Separate and apart from the MERA guidance, Vulcan voluntarily conducted its own health-effects analysis of crystalline silica emissions from the proposed Plant. In that analysis, Vulcan used accepted "computerized air dispersion modeling" techniques to establish an estimate of crystalline silica emissions. An expert toxicologist retained by Vulcan, Lucy Fraiser, testified about the methodology and results of this analysis:

> [Vulcan's] Health and Welfare Effects Analysis for crystalline silica involved: 1) maximum crystalline silica emissions rates estimated as a component of the modeled project-related hourly and annual $PM_{10}$ emissions using analytical results indicating that 0.2% of project-related $PM_{10}$ emissions is crystalline silica . . . ; 2) modeled road emissions; and 3) comparing the modeled $GLC_{max}$ of crystalline silica to the hourly and annual TCEQ ESLs for crystalline silica.

The results of Vulcan's health-effects analysis predicted concentrations of crystalline silica far below the applicable short-term and long-term ESLs. As reflected by Finding of Fact 46, the Commission found that the predicted concentration of crystalline silica would have been below the ESL for that pollutant even if the concentrations had been 135 times higher than that shown by Vulcan's AQA.

Based on both the MERA guidance and Vulcan's voluntary health-effects analysis, we conclude that the Commissioners' determination in Finding of Fact 45—that "[t]he Plant's crystalline silica emissions will not negatively impact human health and welfare, or contravene the intent of the Texas Clean Air Act"—is supported by substantial evidence. Accordingly, the trial court erred in reversing Conclusion of Law 12 on that basis.

***(ii) Whether Vulcan's crystalline silica emissions calculations are based on representative site conditions, and whether substantial evidence supports the TCEQ's determination that Vulcan's silica emissions calculations are representative of those to be expected from the site.***

The trial court also reversed Conclusion of Law 12 on the ground that Vulcan's analysis and calculations of crystalline silica concentrations were not based on "representative site conditions." As explained above, Vulcan had drilled and taken 41 core samples in 2016 but used only three of those in its application to the TCEQ. The Protestants argued, and the trial court agreed, that the three samples Vulcan used in its application did not provide "reliable and accurate data" in determining expected emissions from the facility. We disagree.

Vulcan's expert geologist, Dr. Lori Eversull, testified that the company had, in deciding whether to buy the property, earlier obtained the 41 cores to determine the quantity and quality of the aggregate material at different depths and locations at the site and to ensure the aggregate material would meet the required specifications for construction aggregate. The three cores used in the TCEQ application, from among the 41 cores drilled in 2016, were chosen from the north, central, and southern parts of the property. Dr. Eversull testified that in her opinion the three cores were "representative of the Edwards [Formation] that we will mine as a whole" and that the samples were "collected in a manner that caused it to be a representative sample of the aggregate material that will be processed in the proposed plant."

Doubting the accuracy and representativeness of Vulcan's three core samples, the Protestants obtained their own core sample near—but outside—the western boundary of the Vulcan property. Their analysis of that sample showed the crystalline silica content to be at a level of 1.0% of $PM_{10}$ emissions, in contrast to 0.2% as shown by the analysis of Vulcan's samples. From this they argue that Vulcan's numbers are inaccurate, that a determination of the impact on

human health and welfare of silica emissions from the proposed plant can be made only if all information is known and accurate, and that "[t]here is no way to confirm the accuracy of Vulcan's emissions calculations or their impacts to human health or property without the withheld data."

We have little doubt that the data from Vulcan's 38 unused core samples would be of interest to the Protestants. Indeed, it is not impossible that they could have shown a higher crystalline silica content than the three core samples Vulcan used in its application. But this is not directly relevant to the question of whether Vulcan's silica emissions calculations are "based on representative site conditions." More importantly, the possibility that data from the other core samples from Vulcan's 2016 investigation could show higher silica content levels is only speculation. All that is known for sure from the administrative record is that (1) the crystalline silica content of the core samples obtained by the Protestants, though higher than that of Vulcan's three samples, was still far below the ESL for crystalline silica, and (2) there is direct evidence that the three samples used by Vulcan were "representative" of the Plant site. The chances that knowing the content of the 38 unused core samples would elevate the overall crystalline silica content to a level higher than the ESL for that pollutant appear to be remote. We conclude, therefore, that the Commissioners' ruling that the three core samples used by Vulcan were based on representative site conditions is supported by substantial evidence. Accordingly, the trial court erred in reversing Conclusion of Law 12 on that basis.

### (iii) Whether TCEQ's rejection of Reeh Plaintiffs' assertions regarding ways the Permit allegedly is not protective of public health or property is arbitrary and capricious and not supported by substantial evidence.

Finally, the trial court reversed Conclusion of Law 12 on the ground that the Commission erred in rejecting "Reeh Plaintiffs' assertions regarding ways the Permit allegedly is not sufficiently protective of public health or property." Because the court's Final Judgment does

21

not specify the "assertions" to which it refers, it is difficult to know precisely how to evaluate this finding of error. In his Appellee's Brief in this Court, Reeh argues that the following should have been considered: (1) enclosure of crushing and screening equipment, use of a fabric filter baghouse, and enclosures for stockpiles; (2) fence-line monitoring of air emissions along Vulcan's property line; and (3) excessive hours of operation. We assume these are the assertions to which the trial court's Final Judgment refers.

Our conclusions discussed above—that substantial evidence supports the Commissioners' determination that the proposed plant's crystalline silica emissions will not negatively affect human health or welfare and that the administrative record contains substantial evidence that Vulcan's crystalline silica emissions calculations were based on representative site conditions—largely render the issues in this section of the trial court's Final Judgment academic. Indeed, the essence of Reeh's argument in this regard, as stated in his Appellee's Brief, is that "additional permit controls would . . . make the Permit *more protective* of air quality, human health and property." (Emphasis added.) But whether additional permit controls might have created an even higher level of protection of human health and property was not a material issue. Rather, the central issue for the Commission was whether the public's health and property would be sufficiently protected to meet the requirements of the FCAA and the TCAA. Nonetheless, we will briefly discuss these issues raised in the Reeh Appellee's Brief.

### (a) Enclosure of crushing and screening equipment, use of a fabric filter baghouse, and enclosures for stockpiles.

In his Appellee's Brief, Reeh complains that additional controls such as enclosure of crushing and screening equipment, use of a fabric filter baghouse, and enclosures for stockpiles could have given a higher level of protection from crystalline silica emissions. These matters,

22

however, fall within the category of "best available control technology." As noted above, the trial court's Final Judgment ruled that Vulcan had used and conducted proper BACT reviews, and Protestants did not challenge or appeal that portion of the judgment. Accordingly, they may not complain about the ruling. *See* Tex. R. App. P. 25.1(c) ("A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal.").

### (b) Fence-line air emissions monitoring along Vulcan's property line.

Reeh's Appellee's Brief also mentions that fence-line monitoring would "provide additional important protections." The administrative record, however, contains contrary evidence. One of Vulcan's engineers testified that not only is there no requirement in the TCAA or TCEQ rules that a permit applicant conduct ambient fence-line monitoring for $PM_{10}$ and $PM_{2.5}$, but also there is no suggestion in any written TCEQ guidance that such fence-line monitoring should be required. Nor was he aware of any precedent for fence-line monitoring. Because of the distance of the proposed Plant from the boundary of the Vulcan property, and because Vulcan's AQA demonstrated that crystalline silica emissions from the proposed Plant would not adversely affect public health, welfare, and property, the engineer testified that "I see no need for the Draft Permit to require that Vulcan conduct ambient fenceline monitoring for $PM_{10}$ and $PM_{2.5}$."

### (c) Excessive hours of operation.

Finally, Reeh's Appellee's Brief argues that the proposed plant's operating hours "provide a substantial amount of time that Vulcan's facility will be impacting surrounding landowners, schools, livestock, and businesses." One of Vulcan's expert witnesses testified, however, that the proposed Plant would not adversely affect human health or welfare "even if it was to operate 24 hours a day and 365 days a year." Indeed, Vulcan's AQA was based on an assumption that the plant would operate continuously.

23

Based on the foregoing, we conclude that the trial court erred in ruling that "TCEQ's rejection of Reeh Plaintiffs' assertions regarding ways the Permit allegedly is not sufficiently protective of public health or property is arbitrary and capricious and not supported by substantial evidence."

Accordingly, the trial court erred in reversing Conclusion of Law 12 for the reasons stated in Paragraph 1 of the Final Judgment.

## II. *Whether the trial court erred in reversing Conclusion of Law 14.*

As stated above, the Commissioners' Conclusion of Law 14 recited that "Vulcan has made all demonstrations required under applicable statutes and regulations, including 30 Texas Administrative Code § 116.111 regarding air permit applications, to be issued an air quality permit with conditions as set out in the Draft Permit."[9] To support this conclusion, the Commissioners' order included several findings of fact:

---

[9] Rule 116.111 provides as follows in pertinent part:

(a) In order to be granted a permit, amendment, or special permit amendment, the application must include:
. . . .
    (2) information which demonstrates that emissions from the facility, including any associated dockside vessel emissions, meet all of the following.
    (A) Protection of public health and welfare.
        (i) The emissions from the proposed facility will comply with all rules and regulations of the commission and with the intent of the Texas Clean Air Act (TCAA), including protection of the health and property of the public.
. . . .
    (C) Best available control technology (BACT) must be evaluated for and applied to all facilities subject to the TCAA. . . .
. . . .
    (J) Air dispersion modeling. Computerized air dispersion modeling may be required by the executive director to determine air quality impacts from a proposed new facility or source modification. . . .

24

**Issue A: Whether the proposed plant will negatively affect human health, including sensitive subgroups, and physical property**

22.   The maximum offsite concentrations from AQA are all below applicable National Ambient Air Quality Standards (NAAQS) and Commission Effects Screening Levels (ESLs).

23.  Vulcan's AQA demonstrates that the maximum allowable emissions from the Plant will not negatively affect human health or welfare, including sensitive subgroups, or physical property.

**Issue C: Whether cumulative impacts of existing sources were properly considered**

25. Each of Vulcan's full Minor NAAQS analyses analyzed any cumulative impacts of the emissions from nearby emissions sources by inputting the emissions from the Martin Marietta Materials rock crusher into the modeling, and other off-site emissions sources by adding a representative background concentration of the criteria pollutant to its modeled maximum off-site ground level concentration ($GLC_{max}$).

26. Vulcan's AQA properly considered any cumulative impacts of emissions from nearby operations, plus other offsite emissions sources.

**Issue Q: Whether the permit application, and associated air dispersion modeling, included and properly evaluated all applicable emissions**
. . . .
49. Vulcan's AQA and modeling properly evaluated the identified emissions sources and types of emissions associated with the Plant.

**Issue L: Whether the background concentrations used in the air dispersion modeling are representative of the proposed location of the plant**

40. Vulcan identified ambient air monitors in counties with higher total emissions and higher populations than Comal County, and for each pollutant for which more than one monitor was identified, Vulcan chose as the background concentration the highest concentration from any of those monitors.

41. The background concentrations used in Vulcan's AQA are conservatively representative of ambient concentrations of pollutants at the Plant location.

**Issue R: Whether site specific monitoring data should have been used in the air dispersion modeling conducted for this application**

---

30 Tex. Admin. Code § 116.111(a).

50. The use of site-specific monitoring data was not required in Vulcan's AQA because no site-specific ambient air monitoring data was available.

In reversing the Commissioners' order, the trial court ruled in Paragraph 2 of its Final Judgment that the following errors existed in Conclusion of Law 14:

i) TCEQ's determination that Vulcan's air dispersion modeling adequately accounts for or addresses cumulative impacts; ii) TCEQ's determination that quarry and road emissions were adequately considered; and iii) TCEQ's determination that Vulcan's choice of the relevant background concentrations used in its voluntary Full Minor National Ambient Air Quality Standard ("NAAQS") Analyses were appropriate, is arbitrary and capricious, and not supported by substantial evidence.

The Protestants' witnesses offered evidence that called into question Vulcan's methods, analysis, and conclusions. They raised valid concerns that the ALJs were obliged to hear and consider in preparing their PFD. As discussed below, however, Vulcan presented testimony from numerous witnesses that was directly refutative of the Protestants' evidence, thus rendering that evidence insufficient to overcome the substantial-evidence presumption.

### (i) Whether substantial evidence supports the Commissioners' determination that Vulcan's air-dispersion modeling adequately accounted for cumulative impacts.

In Paragraph 2 of the Final Judgment, the trial court first reversed Conclusion of Law 14 on the ground that Vulcan's air-dispersion modeling did not adequately account for the "cumulative impacts" of other pollutant sources. As discussed above, however, based on the MERA guidance, the $GLC_{max}$ for crystalline silica was below the ESL for that pollutant. Again, the ESL of air contaminant concentration is that level below which the TCEQ does not anticipate air quality will be degraded due to emissions. As stated earlier, the TCEQ's experience, as well as nationwide data, show that rock crushers do not add more than a de minimis amount of crystalline silica to the ambient environment. Thus, based on the TCEQ's experience, whatever pollutant levels existed before the Vulcan Plant's operation began would not be increased

26

to any meaningful degree by crystalline silica emissions from the operation of the facility. Therefore, it was not necessary for Vulcan to take a specific measurement of emissions from other sources. Any shortcomings in Vulcan's air-dispersion modeling thus could not have prejudiced the Protestants' substantial rights.

Nonetheless, a review of Vulcan's full minor-source NAAQS analysis, from which it was determined that crystalline silica levels from all off-site sources were well below the ESL for that pollutant, also reveals substantial evidence to support its conclusion. Vulcan's and the TCEQ's expert witnesses testified in detail about Vulcan's analysis, including specific testimony about how they accounted for the cumulative impacts of emissions from other sources.

Vulcan first obtained from TCEQ a list of facilities permitted for air emissions within a 10-kilometer radial distance from the center of its proposed Plant. Only a Martin Marietta rock-crushing plant satisfied those criteria. The expert witness who conducted the analysis for Vulcan, David Knollhoff, testified that he "input the maximum allowable emissions of each of those emissions sources located within 10-kilometer radial distance from the center of the proposed plant." He went on to testify that Vulcan's analysis

> constituted a cumulative impacts analysis because it considered the cumulative impacts of the emissions of nearby operations, other offsite emissions sources, and the emissions of the proposed plant. More specifically, each full Minor NAAQS Analysis considered the emissions of nearby operations and the emissions of the proposed plant by inputting into the modeling the maximum allowable emissions of each pollutant and averaging time from the nearby operations and the proposed plant to determine the predicted $GLC_{max}$ for that criteria pollutant and averaging time. And, each full Minor NAAQS Analysis considered the emissions of that pollutant and averaging time from other off-site emissions sources by adding to the $GLC_{max}$ for that criteria pollutant and averaging time a background concentration for that criteria pollutant and averaging time that is at least representative.

He testified that emissions from "quarry row," an area in which several large quarries are located and about which one of the Protestants' witnesses expressed concern, emanated more than 10

27

kilometers from the Vulcan Plant site and would have "no cumulative impact with the $PM_{10}$ and $PM_{2.5}$ emissions from other emissions sources located more than 10 km from the proposed plant."

In addition, TCEQ expert witness Rachel Melton testified that

[a] minor NSR full NAAQS analysis requires an evaluation of all on-property facilities, nearby off-property facilities, and representative monitored background concentrations, which are added to the modeled concentration to account for sources not explicitly modeled. . . . .
The full NAAQS analysis [conducted by Vulcan] demonstrated that the proposed emissions are not expected to cause or contribute to an exceedance of the NAAQS.

She concluded by testifying that in her opinion the air-dispersion modeling conducted by Vulcan adequately considered the cumulative impacts of nearby sources.

Another TCEQ expert witness, Dr. Jong-Song Lee, testified that ESLs, which are set to protect against acute and chronic adverse health effects to humans, animals, vegetation, and nuisance conditions, take into account the cumulative effects in areas in which there are multiple facilities of a similar type: "[T]he method for deriving the ESLs addresses both cumulative and aggregate exposures." There is, he explained, "a lot of conservatism in the ESL and layers of conservative assumptions are made in the worst-case modeling analysis itself."

Still other Vulcan and TCEQ witnesses specifically disputed concerns expressed by the Protestants' expert witnesses in their pre-filed testimony.

We conclude that substantial evidence supports the Commissioners' determination that Vulcan's air-dispersion modeling adequately accounted for cumulative impacts of pollutants from other sources. The trial court erred in reversing Conclusion of Law 14 on that basis.

### (ii) Whether substantial evidence supports the Commissioners' determination that quarry and road emissions were adequately considered.

Paragraph 2 of the trial court's Final Judgment also reversed Conclusion of Law 14 on the ground that "TCEQ's determination that quarry and road emissions were adequately

28

considered" was not supported by substantial evidence. It is true that Vulcan's full minor-source NAAQS analysis did not explicitly include potential emissions from all on- and off-site roads and quarries. This alone, however, does not invalidate Conclusion of Law 14.

First, we note again that because the modeling in Vulcan's preliminary-impact analysis showed that crystalline silica levels were below the applicable ESL, it was not necessary for Vulcan to conduct a full minor-source NAAQS analysis or health-effects analysis at all, much less one that took a measurement of other specific sources of emissions. Any shortcomings in Vulcan's full air-dispersion modeling and AQA therefore could not have prejudiced the Protestants' substantial rights.

Second, as stated above, under the TCAA and TCEQ rules an entity is only required to apply for and obtain an air permit for new or modified emissions sources that constitute "facilities." *See* Tex. Health & Safety Code § 382.0518(a). Moreover, the statute commands that the Commission "shall" grant the requested permit if it finds no indication that emissions "from the facility" will contravene the goal of protecting the public's health and physical property. *Id.* The definition of "facility" in the TCAA and TCEQ rules, however, expressly excludes roads and quarries. *See id.* § 382.003(6) ("A mine, quarry, well test, or road is not considered to be a facility."); 30 Tex. Admin. Code § 116.10(4) ("A mine, quarry, well test, or road is not a facility.").

Additionally, the permit that the Commission granted to Vulcan contained a number of special conditions, the purpose of which was to minimize emissions from the quarrying operations and roads on the Vulcan property.

Finally, any emissions from roads and quarries were accounted for through the measurement, using TCEQ stationary monitors, of the cumulative effects of off-site sources and representative background concentrations. As TCEQ witness Melton testified, "A representative

29

background concentration accounts for any sources not explicitly modeled such as roads, natural sources, or other off-property sources." Vulcan's full minor-source NAAQS analysis utilized data from two of the TCEQ's representative monitors. Accordingly, its analysis did include and consider, albeit indirectly, road and quarry emissions. So long as the TCEQ gives reasonable consideration to such matters, as the record shows it did here, courts must leave the question of what constitutes "adequate" consideration to the agency's informed discretion.

We conclude that the TCEQ's determination that quarry and road emissions were adequately considered is supported by substantial evidence. The trial court erred in reversing Conclusion of Law 14 on that basis.

### (iii) Whether substantial evidence supports the Commissioners' determination that Vulcan's choice of the relevant background concentrations used in Vulcan's "full minor NAAQS analyses" were appropriate.

Paragraph 2 of the trial court's Final Judgment also reversed Conclusion of Law 14 on the ground that "TCEQ's determination that Vulcan's choice of the relevant background concentrations used in its voluntary Full Minor National Ambient Air Quality Standard ('NAAQS') Analyses were appropriate was not supported by substantial evidence." The phrase "choice of the relevant background concentrations" in the Final Judgment refers to Vulcan's selection of the TCEQ stationary monitors that it used to determine the background concentrations of particulate matter in the area of the proposed Plant. Friends and Reeh argue, and the trial court agreed, that Vulcan selected monitors that were not representative of air quality at the Plant site.

As Vulcan witness Knollhoff explained, "The background concentration of a pollutant is caused by emissions of that pollutant from existing emissions sources in the area, including industrial emissions sources (such as existing rock crushing plants), mobile emissions sources (such as on-road and off-road vehicles), and natural emissions sources." TCEQ witness

30

Melton explained that stationary monitors are used to account for emission sources that are not explicitly modeled. When cost and logistical constraints prohibit the establishment of site-specific monitors, which is usually the case, "representative monitors" may be used. The TCEQ maintains a network of stationary monitors for this purpose. Ms. Melton testified that

> [t]he existing air monitoring network is the result of a strategic balance of matching federal monitoring requirements with state and local needs. Consistent with federal air monitoring requirements, the TCEQ evaluates the placement of air quality monitors within the air monitoring network using trends in population, reported emissions inventory data, and existing air monitoring data for a given area.

Ms. Melton also testified that an applicant must demonstrate that the monitors it has chosen to use are representative of the site of the proposed facility:

> [I]f there are no existing monitoring data for the county or adjacent county where the project is located, justifying the representativeness of a monitor may include, among other things, comparing county emissions, county population, categories of source emissions for each county, and a quantitative assessment of emissions surrounding the location of the monitor compared to the project site.

In the present case, there were no TCEQ stationary monitors in Comal County. As a result, Vulcan was required to select representative monitors from outside that county to try to estimate the background concentrations of particulate matter at its proposed Plant site. For the measurement of $PM_{10}$ and $PM_{2.5}$, it chose two monitors located in Bexar County, one referred to as the "Selma Monitor," which was used to measure $PM_{10}$, and the other referred to as the "Heritage Middle School Monitor," which was used to measure $PM_{2.5}$.

Mr. Knollhoff testified that for each pollutant he "evaluated the monitors for that pollutant that are located in other counties to determine which of those monitors might have produced representative background concentration data for that pollutant." He stated that he conducted his evaluation of the monitors "in a manner that was consistent with the guidance in Appendix D of TCEQ's Air Quality Modeling Guidelines" and that in his opinion "the background

31

concentrations that I used in the full Minor NAAQS Analyses I conducted for the pollutants and averaging times that will be emitted from the proposed plant are at least representative of the location of the proposed plant."

> In Vulcan's AQA report, Mr. Knollhoff further explained:

> [The] 24-hr $PM_{10}$ monitored background concentration [at the Selma Monitor] is expected to be conservatively higher than is representative of the 24-hr $PM_{10}$ background concentration expected for the area around the proposed crushing plant because there are much more $PM_{10}$ emissions in the area around this monitor than there are in the area around the proposed crushing plant.
> . . . .
> [The] monitored background concentrations [at the Heritage Middle School Monitor] are expected to be conservatively higher than what are representative of the background concentrations for 24-hr $PM_{2.5}$ and annual $PM_{2.5}$ for the area around the proposed crushing plant because there are much more $PM_{2.5}$ emissions in the area around this monitor than in the area around the proposed crushing plant.

The AQA report also stated that "as an extra measure of conservatism, the highest concentration measured at any of the monitors for each pollutant and NAAQS averaging time . . . was used in the Minor NAAQS Analysis for that pollutant and NAAQS averaging time."

> Ms. Melton also testified regarding Vulcan's justifications for selecting these two monitors for measurement of PM background concentrations:

> Vulcan provided a county-wide emissions comparison, a county-wide population comparison, a land use comparison, and a quantitative assessment of emissions surrounding the location of the monitors selected compared to the project site. This assessment included pointing out industry types that were nearby the monitors, which included coal fired power plants, cement plants, and steel plants. It also included consideration of the major roads near the selected monitors.

She testified that based on her review, "the monitors selected by Vulcan [were] representative of the area where the proposed plant will be located."

> We conclude that the TCEQ's determination that Vulcan's choice of relevant background concentrations used in its voluntary full minor-source NAAQS analyses were

appropriate is supported by substantial evidence. The trial court erred in reversing Conclusion of Law 14 on that basis.

The three bases on which the trial court reversed Conclusion of Law 14, discussed above, present instances of conflicting testimony. But it is the province of the agency, like that of a jury, to decide between conflicting evidence:

> The trial court may not set aside an administrative order merely because testimony was conflicting or disputed or because it did not compel the result reached by the agency. Resolution of factual conflicts and ambiguities is the province of the administrative body and it is the aim of the substantial evidence rule to protect that function. The reviewing court is concerned only with the reasonableness of the administrative order, not its correctness.

*Firemen's & Policemen's Civ. Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984); *accord Scally v. Texas State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 452 (Tex. App.—Austin 2011, pet. denied) ("Resolving factual conflicts and ambiguities is the agency's function, and the purpose of substantial-evidence review is to protect that function.").

In the present case, the ALJs—and the Commission—chose to credit certain relevant evidence presented by Vulcan and the TCEQ above that presented by the Protestants. That was the agency's province, and neither we nor the trial court may second-guess its decision. We hold that the findings of fact that underlie Conclusion of Law 14 were supported by substantial evidence. Nor do we see anything about this aspect of the Commissioners' decision that falls within the narrow circumstances, outlined above, in which an agency order may be found to be arbitrary and capricious even though it is supported by substantial evidence. The trial court erred in reversing Conclusion of Law 14 on these bases.

33

**III.** ***Whether the presiding ALJ abused her discretion by ruling that Vulcan could maintain documents from its 2016 subsurface investigation on the Plant site confidential under the trade-secret privilege.***

As explained above, the three core samples Vulcan used as representative samples in analyzing the potential crystalline silica emission from the proposed Plant came from a larger group of cores that it had taken in its 2016 investigation in determining whether to purchase the property and how much to pay for it. The Protestants' discovery request—and subsequent cross-examination attempts—to obtain documents and information about the other cores that Vulcan had not used in its application were denied on the basis of Vulcan's asserted trade-secret privilege.

In Paragraph 4 of its Final Judgment, the trial court ruled that the ALJ "abused her discretion by ruling that Vulcan could maintain information from its 2016 subsurface investigation at the property where the Plant will be located as confidential under the trade secret privilege."[10] In this appeal, the TCEQ and Vulcan argue that the ALJ's trade-secret ruling was within her discretion and, in any event, did not prejudice the Protestants' substantial rights.

The test for identifying an abuse of discretion is "whether the court acted without reference to any guiding rules and principles." *Industrial Specialists, LLC v. Blanchard Ref. Co.*, 652 S.W.3d 11, 16 (Tex. 2022) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). The same standard applies to rulings of an ALJ. *Cotropia v. Texas Med. Bd.*, No. 03-18-00232-CV, 2018 WL 4087408, at *4 (Tex. App.—Austin Aug. 28, 2018, pet. denied) (mem. op.).

In addition, this Court has held that "[i]n order to show harm and obtain a reversal on the grounds that the Commission wrongly excluded evidence requires a showing that the

---

[10] Paragraph 3 of the Final Judgment affirmed the Commissioners' BACT determination.

evidence is controlling on a material issue, not merely cumulative." *Office of Pub. Util. Couns. v. Public Util. Comm'n*, 185 S.W.3d 555, 576 (Tex. App.—Austin 2006, pet. denied).

In general, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding) (quoting *Computer Assocs. Int'l v. Altai*, 918 S.W.2d 453, 455 (Tex. 1996)). The Texas Rules of Evidence provide that "[a] person has a privilege to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, unless the court finds that nondisclosure will tend to conceal fraud or otherwise work injustice." Tex. R. Evid. 507(a).

The Texas Supreme Court has established a specific process for evaluating an asserted trade-secret privilege: "[W]hen trade secret privilege is asserted as the basis for resisting production, the trial court must determine [(1)] whether the requested production constitutes a trade secret; [(2)] if so, the court must require the party seeking production to show reasonable necessity for the requested materials." *In re Union Pac. R.R.*, 294 S.W.3d 589, 592 (Tex. 2009) (orig. proceeding) (quoting *In re Bass*, 113 S.W.3d at 738).

The first question in the supreme court's test is whether a trade secret exists. That determination requires weighing six factors:

> To determine whether a trade secret exists, we weigh the six factors set forth in the Restatement of Torts in the context of the surrounding circumstances: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.*

35

In the present case, Vulcan bore the burden of demonstrating that the requested information constituted a trade secret. In response to the Protestants' motion to compel, Vulcan submitted an affidavit from the Environmental Manager for Vulcan's Southwest Division in which the affiant tracked and discussed each of the six factors listed above. In a well-reasoned order, the presiding ALJ applied the supreme court's test and concluded that Vulcan had established that the requested information constituted a trade secret: "Vulcan treats its subsurface data as a protected trade secret, and expended a significant amount of money to develop it." We conclude that this part of the ALJ's ruling applied appropriate "guiding rules and principles" and therefore was not an abuse of discretion.

The second part of the supreme court's test involves determining whether the requesting party has shown a "reasonable necessity" for the requested materials. This burden rests on the requesting party:

> Once trade secret status has been established, the burden shifts to [the requesting party] to establish that the information is "necessary or essential to the fair adjudication of the case, weighing the requesting party's need for the information against the potential of harm to the resisting party from disclosure." [*In re*] *Bridgestone/Firestone*, [*Inc.*], 106 S.W.3d at 732. We have not "state[d] conclusively what would or would not be considered necessary for a fair adjudication, indicating instead that the application of the test would depend on the circumstances presented." *Id.* "[T]he degree to which information is necessary in a case depends on the nature of the information and the context of the case." *Id.* But, "the test cannot be satisfied merely by general assertions of unfairness;" instead, "a party ... must demonstrate with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *Id.* at 732–33.

*Id.*

In the portion of her order addressing this question, the presiding ALJ concluded from the parties' prefiled testimony that the Protestants could adequately cast doubt on Vulcan's crystalline silica analysis and calculations without the necessity of the trade-secret information.

Accordingly, she ruled that nondisclosure would not work an injustice under the circumstances of this case.

The Protestants desired the requested documents to see if they could use them to attack the accuracy of the conclusions from Vulcan's air-dispersion modeling. As set forth above, however, the MERA guidance itself provides substantial evidence in support of the relevant findings of fact that supported the Commissioners' conclusion that "there is no indication that emissions from the Plant will contravene the intent of the TCAA, including the protection of the public's health and physical property." Moreover, again as stated earlier, the possibility that the requested trade-secret documents might show crystalline silica emissions from the plant to be higher than the ESL for that contaminant is speculative and appears to be extremely remote. Finally, the Protestants' witnesses did a creditable job casting doubt on Vulcan's calculations even without the requested trade-secret information. As a result, we agree with the presiding ALJ that the Protestants could adequately challenge Vulcan's methodology and calculations without the requested information. We conclude that the Protestants have failed to establish that the requested information was "necessary or essential to the fair adjudication of the case" and have failed to demonstrate "exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *Id.*

We therefore hold that the presiding ALJ's ruling denying disclosure of the requested trade-secret documents was not an abuse of discretion and did not prejudice the Protestants' substantial rights; the trial court erred in ruling to the contrary.

**IV.** ***Whether various rulings by the presiding ALJ denied the Protestants' due process rights.***

The discovery dispute regarding the core samples Vulcan took in 2016 has been outlined above. In Paragraph 5 of its Final Judgment, the trial court ruled that the Protestants' due

process rights were infringed by the presiding ALJ's denial of Protestants' motion to compel production of the requested information, as well as other rulings:

> Plaintiffs were denied due process such that their substantial rights were prejudiced by: (1) the Administrative Law Judge's ruling that Vulcan could maintain information from its 2016 subsurface investigation at the property where the Plant will be located as confidential under the trade secret privilege; (2) the Administrative Law Judge's denial of Plaintiffs' discovery and cross-examination of the "privileged" information; and (3) TCEQ's not requiring Vulcan to input emissions from quarries and roads into its modeling for the AQAs for 24-hour $PM_{10}$, 24-hour $PM_{2.5}$, and Annual $PM_{2.5}$.

Due process protections extend to proceedings conducted before an administrative agency. *See City of Corpus Christi v. Public Util. Comm'n of Tex.*, 51 S.W.3d 231, 262 (Tex. 2001) ("This Court has held that in administrative proceedings, due process requires that parties be accorded a full and fair hearing on disputed fact issues. At a minimum, it requires that the 'rudiments of fair play' be observed." (citations omitted)); *see also Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 334 (Tex. 2017) ("In administrative proceedings, the 'rudiments of fair play' must be observed."). However, "due process does not require that administrative proceedings have the full procedural framework of a civil trial." *City of Corpus Christi*, 51 S.W.3d at 262.

### (i) Whether allowing Vulcan to maintain its trade-secret information confidential denied the Protestants' due process rights.

The trial court ruled that allowing Vulcan to maintain the confidentiality of its trade-secret documents and information constituted a denial of the Protestants' due process rights. Having concluded above that the presiding ALJ's denial of the Protestants' motion to compel production of the requested trade-secret information was not an abuse of discretion, it follows that that ruling did not constitute a denial of due process. *See Nath v. Texas Children's Hosp.*, 446 S.W.3d 355, 361 (Tex. 2014) ("A sanctions award that fails to comply with due process

constitutes an abuse of discretion because a trial court has no discretion in determining what the law is or applying the law to the facts."); *Nucor Steel-Texas v. Public Util. Comm'n*, 363 S.W.3d 871, 889 (Tex. App.—Austin 2012, no pet.) ("Having found no abuse of discretion in any of the rulings that Nucor argued were erroneous, we cannot conclude that the Commission's evidentiary rulings deprived Nucor of the right to a fair hearing or violated Nucor's constitutional rights to due process and equal protection.").

We hold that the rudiments of fair play were observed in the SOAH proceeding.

### (ii) Whether denial of attempted cross-examination by the Protestants regarding Vulcan's trade-secret information denied the Protestants' due process rights.

The trial court ruled that prohibiting the Protestants from cross-examining witnesses about Vulcan's trade-secret information also denied the Protestants their due process rights. Having held that the information requested by the Protestants constituted Vulcan's trade secret and that the Protestants failed to establish that such information was "necessary or essential to the fair adjudication of the case," it follows that the presiding ALJ's denial of cross-examination relating to that same information did not deny the Protestants their due process rights. In this regard, again, the rudiments of fair play were observed in the SOAH proceeding.

### (iii) Whether the TCEQ's failure to require Vulcan to input emissions from quarries and roads into its AQA modeling denied Protestants' due process rights.

The trial court ruled that the TCEQ's failure to require Vulcan to input emissions from quarries and roads into its AQA modeling constituted a denial of the Protestants' due process rights. As discussed above, any potential emissions from quarries and roads were rendered irrelevant by the MERA guidance and, in any event, were adequately accounted for by the measurement of $PM_{10}$ and $PM_{2.5}$ taken by stationary representative monitors. The TCEQ's failure

to require Vulcan to specifically include emissions from quarries and roads into its AQA modeling therefore did not prevent the Protestants from receiving a full and fair hearing.

Because the rudiments of fair play were observed in the three matters set forth in Paragraph 5 of the Final Judgment, the trial court erred in ruling that the Protestants were denied due process.

**Conclusion**

Having concluded that the trial court erred in reversing the Commissioners' November 21, 2019 order granting Vulcan's permit application, we reverse the trial court's judgment and affirm the Commissioners' order.

_____

J. Woodfin Jones, Justice

Before Chief Justice Byrne, Justices Kelly and Jones*

Reversed and Rendered

Filed:   March 31, 2023

*Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).